# In the United States Court of Federal Claims

No. 05-214 C
(Filed: June 29, 2009)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| MICHAEL R. PEOPLES, | * | RCFC 12(b)(1); RCFC 52.1; Correction of |
|  | * | Military Records; 28 U.S.C. § 1552; Back |
| Plaintiff, | * | Pay; 37 U.S.C. § 204; Mandatory |
|  | * | Separation; 10 U.S.C. § 632; Medical |
| v. | * | Evaluation Board; Physical Evaluation |
|  | * | Board; Substantial Evidence; Inadequate |
| THE UNITED STATES, | * | Correction Board Decision; Remand |
|  | * | to Correction Board; 28 U.S.C. § 1491 |
| Defendant. | * |  |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

James R. Klimaski, Washington, DC, for plaintiff.

Armando A. Rodriguez-Feo, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff, a retired lieutenant commander with the United States Naval Reserve ("Naval Reserve") alleges that pursuant to the controlling law and regulations, the United States Navy ("Navy") was required to postpone his mandatory separation for medical reasons, and that the decision of the Board for Correction of Naval Records ("BCNR") to the contrary was arbitrary, capricious, contrary to law, and unsupported by substantial evidence. Before the court are Defendant's Motion to Dismiss, or, in the Alternative, for Judgment Upon the Administrative Record and Defendant's Renewed Motion for Judgment Upon the Administrative Record. In its motions, defendant contends that the court lacks jurisdiction to entertain plaintiff's complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), and, assuming, arguendo, that the court possesses jurisdiction, plaintiff's claim must fail on the merits. For the reasons set forth below, the court denies defendant's motions in their entirety and remands the case to the BCNR for further action.

# I. BACKGROUND[1]

Plaintiff enlisted in the Naval Reserve on February 2, 1987, with the intent of obtaining a commission as a reserve officer in the Navy. AR Vol. II at 63, 67, 69-74. On September 25, 1987, upon his completion of Officer Candidate School, plaintiff was commissioned as an ensign in the Naval Reserve and began active duty in the Navy's Surface Warfare Division. Id. at 4, 59, 63, 67, 72-73, 80; Am. Compl. ¶ 6. He was subsequently promoted to the rank of lieutenant (junior grade) on September 25, 1989, AR Vol. II at 60, 80, and the rank of lieutenant on October 1, 1991, id. at 61-62. On April 4, 1995, plaintiff accepted a commission in the Regular Navy, where he served on active duty until his discharge. Id. at 61, 67, 80. During his active duty naval service, plaintiff served aboard the USS Gray (FF 1054), the USS George Washington (CVN 73), and the USS Paul Hamilton (DDG 60), and received exemplary evaluations from his commanding officers. Id. at 6-12, 15-28, 31-32, 35-46. However, for both Fiscal Year 1998 and Fiscal Year 1999, plaintiff was not selected for promotion by the Selection Board. Id. at 80. As a result, pursuant to the applicable law, plaintiff was slated for separation from the Navy. See id. at 65; Am. Compl. ¶ 11. At the end of August 1998, in preparation for his separation, he was assigned temporary duty with the Commander of Destroyer Squadron Thirty-One in Pearl Harbor, Hawaii. AR Vol. II at 45-46 (containing a March 1999 Fitness Report and Counseling Record indicating a transfer date of August 28, 1998), 110 (indicating a transfer date of August 31, 1998). The Navy issued, and plaintiff received, plaintiff's mandatory separation orders on October 15, 1998, indicating that plaintiff was to be separated by no later than March 1, 1999. AR Vol. I at 265, 287-89, 292; see also AR Vol. II at 80 (indicating an administrative separation date of March 1, 1999). But see Am. Compl. ¶ 11 (indicating that plaintiff received his mandatory separation orders on October 22, 1998).

Plaintiff received regular medical care throughout his naval service. See generally AR Vol. I at 16-235 (containing medical records from plaintiff's time in Officer Candidate School, on active duty, and postseparation). Among the problems that appear in the more than twelve

---

[1] The court has derived the facts in this section from plaintiff's First Amended Complaint ("Am. Compl.") and both volumes of the Administrative Record ("AR Vol. I" and "AR Vol. II," respectively). Some pages in the Administrative Record are printed double-sided, but lack page numbers on the reverse side. For ease of reference, the court appends a "b" to the page number when citing the reverse side of a page. Further, although neither party objected to the extrarecord evidence submitted by the opposing side (i.e., the Declarations of David Svirsky and Noel S. Howard, M.D. submitted by defendant and the Affidavit of Michael R. Peoples submitted by plaintiff), the court declines to consider the information because it is unnecessary to render effective judicial review in this case. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380-81 (Fed. Cir. 2009).

years of records are knee pain, back pain, and a lack of sensation in his legs.[2]  See generally id.
On various occasions during this time period, plaintiff's physicians recommended restrictions on
plaintiff's physical activity.  See, e.g., id. at 159b (May 15, 1995 restrictions due to back pain),
173b (April 1991 restrictions due to back pain), 190-91b (September 1989 restrictions due to
knee pain), 192 (December 9, 1988 restrictions due to knee pain).  He also underwent physical
therapy.  See, e.g., id. at 52 (March 9, 1999), 129 (February 23, 1999), 143 (December 15, 1998),
164 (August 13, 1993), 168 (July 6, 1993), 188 (September 12, 1989).  On September 14, 1997,
plaintiff underwent his last periodic physical examination prior to his separation physical
examination.  Id. at 199-200b.  But see id. at 243 (indicating, in a February 12, 1999 nonmedical
assessment, that plaintiff's most recent physical fitness test/physical readiness test was in March
1998).  He reported, among other things, a history of knee pain and intermittent back pain.  Id. at
200b.  However, the physician assistant's clinical assessment of plaintiff was normal, and
plaintiff was deemed to be "qualified."  Id. at 199-199b; cf. AR Vol. II at 44 (containing a July
1998 Fitness Report and Counseling Record prepared by plaintiff's commanding officer
indicating that plaintiff "[s]cored an 'outstanding' on [his] most recent [physical readiness
test]").

On October 22, 1998, shortly after plaintiff received his mandatory separation orders, he
was seen at the Navy's Pearl Harbor Adult Clinic with, among other complaints, "lots of stress"
over the last two months, back pain, and knee pain.  AR Vol. I at 151; accord id. at 265.  Because
the Navy lacked an orthopedist on the island of Oahu, plaintiff was referred to Tripler Army
Medical Center ("TAMC") in Honolulu for his knee and back pain.  Id. at 265.  He was
ultimately able to obtain an appointment for November 20, 1998, at which time he also visited
the Pain Clinic and had an x-ray of his lumbar spine.  Id. at 116, 141, 145-49, 265.  The
orthopedist also ordered magnetic resonance images ("MRIs") of plaintiff's lumbar spine and
right knee.  Id. at 145.  In addition to his treatment at TAMC, throughout November and into
December, plaintiff saw a number of medical personnel, including physicians and physical
therapists, at the Pearl Harbor Medical Clinic for his complaints.  See, e.g., id. at 143-44, 150,
156-58.

Plaintiff underwent his required separation physical examination on December 16, 1998,
at the Pearl Harbor Medical Clinic.[3]  Id. at 230-33, 239-42; AR Vol. II at 97-98, 102-03.  On his

---

[2]  Plaintiff's medical records first reference knee pain in December 1988, AR Vol. I at
192, 194, back pain in April 1991, id. at 173, and radiating leg pain in November 1998, id. at
141, 145.

[3]  The complete records for this examination are not found in any one place in the
Administrative Record.  It appears that the following forms constitute the complete record for
plaintiff: (1) a two-page Report of Medical History (Standard Form 93) that, due to the number
of comments by the examiner, has been continued on a duplicate second page, making a total of
three pages; (2) a two-page Report of Medical Assessment (DD Form 2697); and (3) a two-page
Report of Medical Examination (Standard Form 88).  Volume II of the Administrative Record,

Report of Medical History, plaintiff highlighted a number of issues in his medical history, including his knee and back problems.  AR Vol. I at 98; AR Vol. II at 232, 241; see also AR Vol. I at 240 (containing the physician assistant's notes about plaintiff's medical history on a Report of Medical Assessment form).  He also reported all of his recent consultations and the fact that he had consultations with an orthopedist prior to 1998.  AR Vol. I at 241.  The physician assistant reviewed and commented on plaintiff's reported medical history.  Id.; AR Vol. II at 98.  He then noted, in his Report of Medical Examination, that plaintiff had a history of, among other things: (1) decreased sensation radiating down the left leg; (2) chronic back pain; and (3) chronic knee pain.  AR Vol. II at 102.  The physician assistant recommended that plaintiff follow-up with physicians at the Pearl Harbor Medical Clinic, TAMC, and the Department of Veterans Affairs ("VA") for all of his health issues.  Id. at 103; AR Vol. I at 240.  He then checked the box next to "is qualified for," next to which is a handwritten notation "separation board," with "separation" crossed out and "board" underlined.[4]  AR Vol. II at 103; see also id. at 309 (averring that at his separation physical examination, he was declared "Fit for MEDBOARD," not "Fit for Separation"); cf. id. at 103 (containing a stamp stating: "Separation examination completed[.] All appropriate treatment not completed within 180 days of separation.").

Three days later, on December 19, 1998, plaintiff had his scheduled MRIs taken at TAMC.  AR Vol. I at 111-12, 114-15.  The knee MRI revealed, among other things, "severe chondromalacia patella, Grade IV, with subchondral degenerative geodes in the lateral facet with diffuse cartilage narrowing."  Id. at 112.  The spine MRI revealed, among other things, "[m]ild rotary spondylolisthesis of L5 in relationship to S1 with bilateral pars defects and moderate canal stenosis."  Id. at 115.

Plaintiff returned to the Orthopedic Clinic at TAMC on January 15, 1999, where he was provided the findings of the MRIs.  Id. at 140; Am. Compl. ¶ 12.  The orthopedist recommended arthroscopic surgery of plaintiff's right knee and a "possible" L5-S1 fusion procedure.  AR Vol. I

---

which contains plaintiff's service record, includes the makeshift third page of the Report of Medical History, AR Vol. II at 98, and the Report of Medical Examination, id. at 102-03.  Volume I of the Administrative Record includes the proceedings before the BCNR.  Thus, this volume includes the medical records submitted by plaintiff to the BCNR, among which are the first page of the Report of Medical History, AR Vol. I at 232, the first page of the Report of Medical Assessment, id. at 231, and the first page of the Report of Medical Examination, id. at 230.  This volume also includes the MEB package that plaintiff provided to the BCNR, which contains the second page of the Report of Medical History, id. at 241, the second page of the Report of Medical Assessment, id. at 240, and the first page of the Report of Medical Examination, id. at 239.

[4]  Because there is a note dated February 10, 1999, alongside this language, it is unclear when the words "separation" and "board" were written, struck through, and underlined.  See AR Vol. II at 103 ("2/10/99 - has a Med Eval Board letter - by TAMC ortho - recommend retention & have procedures to lt. knee arthroscopy, & spinal fusion performed").

at 140.  According to plaintiff, he was told that he needed to undergo both surgical procedures "as soon as possible," that "he was no longer fit for sea duty," that "he should avoid ladders and stairs," and that he should not "lift anything over ten pounds."[5]  Am. Compl. ¶ 13; accord AR Vol. I at 266.  In a January 19, 1999 notation on the January 15, 1999 record from the Orthopedic Clinic, plaintiff's orthopedist further suggested, with respect to plaintiff's spinal issues: "Stabilization training x 3 months.  If no improvement, then spinal fusion, requiring 6 month[s] to [a] year for full recovery.  Potential for return to full duty [illegible] 99.  No sea duty.  Recommend [Physical Evaluation Board ("PEB")]."[6]  AR Vol. I at 140.

After his appointment with the orthopedist at TAMC, plaintiff proceeded to the Patient Administration office at the Navy's Pearl Harbor Medical Clinic, where he conferred with both the PEB representative and the Leading Chief Petty Officer.  Id. at 266; Am. Compl. ¶ 14.  They informed him that "although he was no longer fit for sea duty, the Navy would not place him on limited duty because he had received his mandatory separation orders."  Am. Compl. ¶ 14; accord AR Vol. I at 266.  They also informed him that only the Bureau of Naval Personnel could hold him beyond his mandatory separation date.  AR Vol. I at 266.  To obtain such a postponement, they explained, his orthopedist at TAMC would need to convene a Medical Evaluation Board ("MEB") and forward the MEB report and supporting materials to the PEB.  Id.  Plaintiff was told that so long as the PEB received the MEB package by midnight on March 1, 1999, his "separation would be held in abeyance pending PEB action."  Id.; accord Am. Compl. ¶ 16.

Plaintiff was referred to the PEB on January 20, 1999.  AR Vol. I at 292; see also id. at 139 (containing an internist's January 29, 1999 clinical notes that include the following notation: "PEB for Ortho in process").  On January 27, 1999, personnel from the Pearl Harbor Medical Clinic requested that the Navy hold plaintiff's mandatory separation orders in abeyance pending the PEB.  Id. at 292.  But see id. at 266-67 (indicating that there was a similar request on January 17, 1999).  Subsequently, on January 31, 1999, plaintiff was transferred to temporary duty at the Transient Personnel Unit at Naval Station Pearl Harbor so that he could undergo the PEB.  AR Vol. II at 45 (Fitness Report and Counseling Record), 110 (History of Assignments).  But see AR Vol. I at 268 (contending that plaintiff was not transferred until February 27, 1999, backdated to January 29, 1999, because his command believed that he would be placed in a medical hold status).

---

[5]  Plaintiff indicates that he received this advice from his "treating physicians" at the Pearl Harbor Medical Clinic.  Am. Compl. ¶ 13.  However, there are no medical records in the administrative record from that venue dated January 15, 1999.

[6]  A PEB is convened to determine whether a service member is fit for duty.  See, e.g., AR Vol. I at 309 ("[T]he ONLY body capable of determining the 'fitness' of a member of the Navy is the Physical Evaluation Board." (citing Secretary of the Navy Instruction ("SECNAVINST") 1850.4D (Dec. 23, 1998))).

As noted by his internist on February 5, 1999, however, plaintiff was having difficulty with the PEB process:

> Is getting a run around from Ortho attempting to get PEB done.  He was 1st told PEB would be done at [TAMC] by his Ortho, Dr. [Jeffrey J.] Meter.  Then told not to have PEB until [after] arthroscopy.  But he now was told he would see a PEB person at [TAMC] on the 9th, but told to see one at [Pearl Harbor Medical Clinic] on the 8th.  He is very upset.

AR Vol. I at 134; see also id. at 267 (explaining plaintiff's "thrice weekly visits to Patient Admin[istration]" and "daily shuttle trips between" Patient Administration and TAMC to facilitate the convening of an MEB, as well as the procedural difficulty in having the Army prepare an MEB report for him, a Navy officer).  He ultimately had his MEB appointment at TAMC on February 9, 1999.  Id. at 131; see also Am. Compl. ¶ 15 (indicating that an MEB had been convened).  In his February 10, 1999 report, Dr. Richard C. Rooney, an orthopedist,[7] assessed:

> Left L4-5 herniated nucleus pulposus as well as mild L5-S1 spondylolisthesis and severe degenerative changes to [plaintiff's] patellofemoral cartilage in his right knee as well as a lateral meniscal tear.  His back and knee problems are most likely the result of progressive degeneration as a result of the physical requirements of his rank in the U.S. Navy.  Current prognosis with nonoperative therapy is that his back and knee pain will progressively worsen with increasing debility.  However, the prognosis after operative stabilization and potential decompression of his spine as well as debridement of his lateral meniscal tear is excellent with a very high likelihood of full recovery and the ability to resume full active duty status in the United States Navy.  It is likely that his impairment due to his back and knee conditions were related, and that his inability to maintain erect posture, inability to negotiate stairs and ladders, inability to stand for prolonged periods of time were related.

AR Vol. I at 237-38.  Dr. Rooney concluded: "The recommendation is that [plaintiff] maintain himself on active duty status and undergo right knee arthroscopy and, after three months stabilization training of his lumbar spine, undergo probable spinal fusion at L5-S1.  This case is being referred to the Central Physical Evaluation Board for adjudication."  Id. at 237; accord AR Vol. II at 103 (containing the record from plaintiff's separation physical examination, which includes the following note: "2/10/99 - has a Med Eval Board letter - by TAMC ortho - recommend retention & have procedures to lt. knee arthroscopy, & spinal fusion performed").

---

[7]  Plaintiff's regular orthopedist, Dr. Meter, was unavailable to prepare the MEB report.  AR Vol. I at 267.

Plaintiff hand delivered Dr. Rooney's report to Patient Administration and was advised that he could provide a written response to the report. AR Vol. I at 267; see also id. at 250 (reflecting plaintiff's intent to provide such a response). He prepared his response on February 11, 1999, providing additional information and supporting Dr. Rooney's ultimate recommendation. Id. at 247-49. He hand delivered his response to Patient Administration that same day. Id. at 267. After some delay due to the Navy's continued uncertainty that it could use an MEB report from the Army,[8] id., Dr. Rooney reviewed plaintiff's response on February 23, 1999, indicating that no changes to his MEB report were necessary. Id. at 246. To complete the MEB package, the Commander of Destroyer Squadron Thirty-One prepared a nonmedical assessment of plaintiff on February 12, 1999. Id. at 243-44. In his assessment, the Commander indicated, among other things, that plaintiff's condition required him to be away from his duties for an average of eight hours per week and that he was not then "worldwide assignable." Id. at 243-44. He then recommended that plaintiff be permitted "another period of Temporary Limited Duty" and "to remain on active duty in a Permanent Limited Duty Status if found Unfit." Id. at 244.

Although plaintiff had been informed that the MEB package would be ready for mailing on February 19, 1999, id. at 267, the commanding officer of the Pearl Harbor Medical Clinic did not approve the package until February 25, 1999, id. at 236, 268, 292. Given his looming mandatory separation, plaintiff consulted with Patient Administration, who confirmed with the Bureau of Naval Personnel that an MEB package transmitted to the PEB via facsimile would be sufficient to delay his discharge, so long as the original version was in the mail. Id. at 268. However, the next day, Patient Administration told plaintiff that the Bureau of Naval Personnel had reversed itself and advised that a facsimile transmission would not be acceptable. Id. Plaintiff volunteered to pay for overnight mailing, but was informed that he was not permitted to do so. Id. The Chief Staff Officer of Destroyer Squadron Thirty-One interceded on plaintiff's behalf, and was informed that the MEB package "would be mailed in sufficient time to reach [the] PEB by the midnight March 1st deadline." Id.

The next day, February 26, 1999, plaintiff was informed that his MEB package had not been mailed. Id. The Chief Staff Officer was then told that the MEB package "had been mailed via overnight mail and would arrive at the PEB no later than Sunday, February 28th." Id. Based on this information, the Chief Staff Officer allowed plaintiff to travel to a conference at Andrews Air Force Base near Washington, DC to make a presentation. Id.; see also id. (indicating that plaintiff had volunteered to hand deliver his MEB package to the PEB, which was located in Washington, DC, but was informed that he could not do so). Accordingly, plaintiff left for Washington, DC on February 28, 1999. Id. at 269. However, upon his arrival on March 1, 1999,

---

[8] However, it is apparent that plaintiff remained confident that the PEB would receive the MEB package prior to March 1, 1999, thus postponing his separation date, because during a follow-up appointment with a physical therapist at the Pearl Harbor Medical Clinic on February 23, 1999, he indicated that he was scheduled to have arthroscopic surgery on his right knee on March 11, 1999, and spinal fusion one month afterwards. AR Vol. I at 129.

he was instructed to immediately return to Hawaii because his MEB package had not been mailed and thus he would be separated at midnight that day. Id.

Through no fault of plaintiff, indeed, despite plaintiff's best efforts, the PEB did not receive his mailed MEB package until March 2, 1999. Id.; Am. Compl. ¶ 17. Although the MEB package had been transmitted to the PEB via facsimile prior to March 1, 1999, AR Vol. I at 292, and without confirming whether plaintiff had been separated, id. at 269, the Navy instructed the PEB to not review it, Am. Compl. ¶ 17.

In fact, notwithstanding his mandatory separation orders, plaintiff was not discharged on March 1, 1999. See id. ¶ 18 (indicating that the Navy postponed plaintiff's discharge); AR Vol. I at 292 (citing section 3830240(1)(b) of the Naval Military Personnel Manual ("MILPERSMAN") for the proposition that "officers in receipt of separation orders who are pending a physical evaluation board will not be separated without specific direction" from the Chief of Naval Personnel). Rather, on March 4, 1999, the Personnel Support Detachment at Pearl Harbor, citing MILPERSMAN § 3830240(1)(b) and noting both the timely facsimile transmission and untimely mailing of the MEB package, sought the "appropriate disposition" for plaintiff from the Bureau of Naval Personnel. AR Vol. I at 292. It emphasized that plaintiff was "not physically qualified for separation" and that his attending physician recommended plaintiff "undergo major surgery (spine) and aftercare/recovery over the next 06 months." Id. The Commander of Naval Personnel Command responded the following day. Id. at 293. He first noted that paragraph 4B of Navy Administrative Message 064/95 provided that "[members] pending a mandatory separation or retirement will not be delayed unless [the member] is either hospitalized or a medical board report has been accepted by the PEB for disability evaluation processing prior to the mandatory release/retirement date." Id. The Commander then indicated that he had confirmed with the PEB that the "PEB did not accept" plaintiff's MEB package. Id. Accordingly, he directed the Personnel Support Detachment to discharge plaintiff effective March 1, 1999, at 11:59 p.m. and indicated that plaintiff's relief resided with the BCNR. Id.; accord id. at 269.

Despite the Commander's instruction, the Navy did not discharge plaintiff. In an effort to clarify his status and seek a deferment of his discharge date, plaintiff and his family corresponded and consulted with a number of government officials. Id. at 269; see also id. at 275-85 (containing some of the correspondence). Plaintiff underwent the scheduled arthroscopic surgery at TAMC on March 11, 1999, id. at 41-43, 51, 270; Am. Compl. ¶ 20, obtaining a postoperative diagnosis of "[r]ight knee patellofemoral chondromalacia, grade III," AR Vol. I at 41. The next day, the Personnel Support Detachment at Pearl Harbor informed the Commander of Naval Personnel Command that it was separating plaintiff effective March 15, 1999. Id. at 291; accord id. at 270; Am. Compl. ¶ 18. Despite this two-week postponement of plaintiff's separation from the Navy, the appropriate officials did not resubmit his MEB package to the PEB and the PEB did not consider plaintiff's MEB package during that time. Am. Compl. ¶ 18; AR Vol. I at 270. Thus, on March 15, 1999, plaintiff was honorably discharged from active duty, Am. Compl.

¶¶ 18, 21; AR Vol. II at 65, 67, 110, 270, remaining on inactive duty in the Naval Reserve,[9] AR Vol. II at 67.  Subsequently, after a spinal discogram revealed three herniated discs, AR Vol. I. at 34-35, 270, he underwent the recommended spinal fusion procedure on April 12, 1999, at TAMC, id. at 34-35; Am. Compl. ¶ 22.

After his spinal surgery, plaintiff was unable to work or otherwise perform active duty in the Naval Reserve.  AR Vol. I at 270, 272-73.  He applied, unsuccessfully, for unemployment, Social Security Disability, and welfare benefits, and eventually exhausted his savings.  Id. at 270-73.  He finally received assistance from the VA, which, after determining that plaintiff's knee and back injuries were service-connected on September 16, 1999, id. at 294-300, and that his combined disability rating was eighty percent, id. at 297, awarded him "individual unemployability benefits" on September 28, 1999, id. at 301-02.  See also id. at 272 (providing plaintiff's explanation of the VA's findings).  The VA subsequently approved him for Vocational Rehabilitation benefits on January 19, 2000.  Id. at 274.

Plaintiff, acting pro se, sought relief from the BCNR on July 28, 2000.  AR Vol. I at 12.  Specifically, in a letter attached to his Application for Correction of Military Record, plaintiff requested the following: (1) "expeditious consideration" of his application; (2) placement on active duty effective March 16, 1999; (3) back pay from March 16, 1999, to September 30, 1999, at the lieutenant rate; (4) back pay from September 30, 1999, to either (a) the last date of his rehabilitation or (b) the present, whichever is earlier, at the lieutenant commander rate; (5) the forwarding of a "new, 'correct'" MEB package to the PEB for "due consideration and action"; (6) "if required, [Permanent Change of Station] orders to an appropriate area for follow-up care/rehabilitation"; (7) if found unfit for duty by the PEB, the resetting of all discharge proceedings to conform with the new discharge/retirement date; (8) any discharge following action by the PEB be as a lieutenant commander; and (9) an "accommodation . . . between the Navy, the VA, and Social Security in order to 'limit [his] liability' with respect[] to paying back any monies received."  Id. at 14-15.  Based on plaintiff's requested relief, it is apparent that he was not seeking a particular determination of fitness or unfitness from the PEB or the BCNR, but rather a rectification of the Navy's failure to timely forward his MEB package to the PEB, such that he would be restored to active duty status while the PEB considered whether he was fit for duty.

On August 16, 2000, the BCNR requested from the relevant authorities copies of any PEB proceedings, the VA's Rating Decisions, and plaintiff's medical records.  Id. at 10-11.  The BCNR then forwarded the records it received, along with plaintiff's service record, to the

---

[9]  Plaintiff was promoted to the rank of lieutenant commander with the Naval Reserve on October 1, 1999.  AR Vol. II at 80.  But see id. at 111 (indicating that plaintiff accepted an appointment as a lieutenant commander on January 26, 2000, with "a date of rank of October 1, 2000").  On June 28, 2002, he was honorably discharged from the Naval Reserve.  Id. at 68, 80.

Director of the Naval Council of Personnel Boards on October 2, 2000, with the following queries:

> In your opinion, was [plaintiff] unfit for duty on 1 March 1999?[10]  Should he have been retained on active duty until such time as disability evaluation could be completed?  He is not physically qualified for (NPQ) for service in the Naval Reserve.  In the event he elects a hearing before the PEB, will the PEB make a determination of his fitness for duty, as in cases where the provisions of paragraph 1003d, SECNAVINST 1850.4D apply, or will the finding be limited to PQ or not NPQ?

Id. at 9 (footnote added).  The Director responded to these queries in an October 24, 2000 letter, finding first that "the evidence in this case does not support a finding that [plaintiff] was unfit for duty on 1 March 1999."  Id. at 6; accord id. at 7 (finding that plaintiff was "technically Fit (except for shipboard deployability)" for PEB purposes).   In support of this finding, the Director noted that (1) based on the lack of "an Officer's Fitness Report for [plaintiff]'s last eight to nine months on active duty," he presumed that plaintiff "was able to perform duties appropriate to his rank and designator during [that] time"; (2) plaintiff had to "attest to his fitness and submit any evidence to the contrary" when he accepted his reserve commission; (3) although it was "clear that corrective surgery had been recommended," there was no indication of "clinical urgency" in plaintiff's medical records at the time of his separation; and (4) plaintiff sought civilian employment prior to his discharge.  Id. at 6.  The Director also noted that (1) plaintiff's "persistent history of low back pain" had been resistant to treatment for the six years prior to his mandatory separation; (2) had plaintiff been retained on active duty, he would not have been found to be unfit until the failure of his spinal surgery had been ascertained; and (3) plaintiff's "major medical difficulties appear to have occurred" after his spinal surgery, and not at the time of his mandatory separation.  Id. at 6-7.  The Director finally found that if plaintiff requested a PEB as a reservist, the PEB's inquiry would be limited to whether plaintiff was physically qualified or not physically qualified, and would not touch upon his fitness for duty.  Id. at 7.

The BCNR forwarded the Director's advisory opinion to plaintiff on October 25, 2000, for his review and comment.  Id. at 8.  Plaintiff responded in a January 23, 2001 letter, highlighting the following evidence supporting his lack of fitness at the time of his separation: (1) his medical records demonstrated the chronic nature of his knee and back injuries, dating back to 1989 and 1991, respectively; (2) his medical records demonstrated the limitations placed upon his activities by his physicians because of these injuries; and (3) his inability to fully perform the duties of his office (Combat Systems Officer/Physical Security Officer aboard the USS Paul Hamilton), grade (lieutenant), or rating (Surface Warfare Officer).  Id. at 4.  He also contended that "reasonable doubt" existed as to whether he was fit for duty at the time of his separation, pointing to the recommendation of the MEB, the contents of his response to the MEB

---

[10]  As previously noted, plaintiff did not request a finding that he was unfit for duty in his application to the BCNR.  Rather, he requested that the PEB duly consider his MEB package.

report, and the recommendations contained within the nonmedical assessment that accompanied the MEB report.  Id. at 5.  Plaintiff next explained that although he sought civilian employment prior to his separation, he informed all of his prospective employers that his discharge date from the Navy was uncertain because he "was being held on active duty in order to correct some medical problems."  Id.  He also explained that he had signed his Reserve Oath of Office in December 1998, prior to learning of the MRI results that would conclusively preclude him from serving in the active reserves.  Id.  Plaintiff concluded his letter by citing several provisions of SECNAVINST 1850.4D that demonstrated the errors that had occurred in the processing of his MEB report and the failure to convene a PEB.  Id.

The BCNR considered plaintiff's application on March 8, 2001, voting to deny relief.  Id. at 1, 3.  It informed plaintiff of its decision in an April 2, 2001 letter, explaining:

> After careful and conscientious consideration of the entire record, the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice.  In this connection, the Board substantially concurred with the comments contained in the advisory opinion.  It noted that your separation was in accordance with 10 U.S. Code 631, based on your failure of selection for promotion.[11]  Although the Secretary of the Navy could have deferred your separation under the terms of 10 U.S. Code 640, had he decided that additional time was needed for the evaluation of your physical disability, you did not have the right to be retained on active duty.  The Board was not persuaded that there was inordinate delay in the processing of your case by naval medical authorities, or that the failure of the Secretary to defer your mandatory separation was erroneous or unjust.  Accordingly, your application has been denied.

Id. at 1 (footnote added).  The BCNR did not make an express finding of whether plaintiff was fit for duty at the time of his separation.

Plaintiff filed a complaint in this court on February 11, 2005, and an amended complaint on September 2, 2005.  He states two claims for relief.  First, plaintiff contends that the BCNR's failure to correct "his military records to reflect that he was unfit for duty at the date of discharge and thus entitled to PEB review prior to discharge . . . was arbitrary, capricious, unsupported by substantial evidence or contrary to applicable law or regulation."  Am. Compl. ¶ 27.  Second, plaintiff asserts that the BCNR's failure to correct his military records precluded him "from receiving military pay, allowances, disability retirement, and other benefits."  Id. ¶ 29.  Accordingly, plaintiff requests the following relief: (1) "[r]einstatement to active duty as of March 15, 1999, the date of discharge"; (2) "[b]ack pay, allowances and benefits from March 15, 1999"; (3) an order directing the Navy to convene a PEB on plaintiff's behalf; (4) attorney's fees

---

[11]  Because the advisory opinion does not cite or otherwise refer to 10 U.S.C. § 631, the court presumes that the pronoun "it" that begins this sentence refers to the BCNR.

and costs; and (5) "[a]ny further relief that this Court deems just and proper." Id. § V.  The parties have fully briefed defendant's motions, and oral argument was heard.[12]  The court is now prepared to rule.

## II.  DEFENDANT'S MOTION TO DISMISS

### A.  Standard of Review

The court must first address defendant's RCFC 12(b)(1) motion to dismiss.  In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor.  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  However, plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction.  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction.  Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974); Reynolds, 846 F.2d at 747.  If the court concludes that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B.  Subject Matter Jurisdiction

Whether the court has jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time.  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).

The Tucker Act, the principal statute governing the jurisdiction of this court, provides that the Court of Federal Claims has jurisdiction over claims against the United States that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2006).  The Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money

---

[12]  The case was transferred to the undersigned on March 6, 2009, subsequent to oral argument.

damages." <u>United States v. Testan</u>, 424 U.S. 392, 398 (1976).  Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." <u>Loveladies Harbor, Inc. v. United States</u>, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). To find that a constitutional provision, statute, or regulation is money-mandating, "the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." <u>Eastport S.S. Corp. v. United States</u>, 372 F.2d 1002, 1007 (Ct. Cl. 1967); <u>see also</u> <u>id.</u> at 1009 ("Under Section 1491, what one must always ask is whether the constitutional clause or legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.").

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has instructed that when engaging in a jurisdictional analysis, a court must determine whether the plaintiff has alleged a right to recovery premised upon a money-mandating constitutional provision, statute, or regulation. <u>Fisher v. United States</u>, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (en banc portion).  "If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case in the normal course." <u>Id.</u>  "Only after this initial inquiry is completed and the Court of Federal Claims takes jurisdiction over the case does it consider the facts specific to the plaintiff's case to determine 'whether on the facts [the plaintiff's] claim f[alls] within the terms of the statutes.'" <u>Greenlee County, Ariz. v. United States</u>, 487 F.3d 871, 876 (Fed. Cir. 2007) (quoting <u>Fisher</u>, 402 F.3d at 1172); <u>accord</u> <u>Yant v. United States</u>, 85 Fed. Cl. 264, 269 (2009) ("Subject matter jurisdiction is determined independently of analyzing whether a plaintiff might ultimately succeed on the merits.").  As explained by the Federal Circuit in <u>Jan's Helicopter Service, Inc.</u>:

> In determining whether the Court of Federal Claims has jurisdiction, all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source.  There is no further jurisdictional requirement that the court determine

whether the additional allegations of the complaint state a nonfrivolous claim on the merits.[13]

525 F.3d at 1309 (footnote added).

## C.  The Court Possesses Jurisdiction Over Plaintiff's Amended Complaint

In his amended complaint, plaintiff has alleged jurisdiction pursuant to 28 U.S.C. § 1491(a)(1)-(2) (2000 & Supp. IV 2005); 37 U.S.C. § 204(a)(1) (2000 & Supp. IV 2005); and 10 U.S.C. § 1552 (2000 & Supp. IV 2005). Am. Compl. ¶¶ 1-3.  Before the court can determine whether these statutes provide the basis for jurisdiction in plaintiff's case, it must ascertain the true nature of plaintiff's claim.  As noted above, plaintiff's complaint is premised upon his assertion that the BCNR failed to correct "his military records to reflect that he was unfit for duty at the date [of] discharge and thus entitled to PEB review prior to discharge . . . ."  Id. ¶ 27.  This is problematic because, in his application to the BCNR, plaintiff did not request that the BCNR find him unfit for duty.  See AR Vol. I at 14-15.  Rather, plaintiff merely requested that he be returned to active duty so that the PEB could evaluate whether he was fit for duty.  See id.  As a result, the BCNR did not make an express finding that plaintiff was fit or unfit for duty, see id. at 1, even though it was empowered to make such a finding, see Sawyer v. United States, 930 F.2d 1577, 1581 (Fed. Cir. 1991) (noting that correction boards are "competent to make a disability determination in the first instance").

As noted above, the court must construe the allegations in plaintiff's complaint in his favor.  Henke, 60 F.3d at 797.  Given that plaintiff challenges the outcome of the proceedings

---

[13]  This holding stands in contrast with the holding in a prior Federal Circuit panel decision that United States Supreme Court precedent required, as a jurisdictional prerequisite, a determination that a plaintiff's claim was not frivolous.  See Moden v. United States, 404 F.3d 1335, 1340-41 (Fed. Cir. 2005) (citing Steel Co., 523 U.S. at 89 ("[D]ismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'")).  When "there is direct, irreconcilable conflict between two panel decisions of the Federal Circuit, the earlier decision is controlling precedent."  Briseno v. United States, 83 Fed. Cl. 630, 633 n.5 (2008) (citing Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 765 (Fed. Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc.  Where there is direct conflict, the precedential decision is the first." (citation omitted))).  However, "the Jan's Helicopter panel announced that any contrary aspects of the Moden discussion of the 'nonfrivolous' claim issue were dicta . . . ."  Id.; see Jan's Helicopter Service, Inc. v. FAA, 525 F.3d 1299, 1308 n.9 (Fed. Cir. 2008) ("In any event, the court's statements [in Moden], quoted at page 4 of the dissent, are dicta, and we are not bound by them . . . .").  Consequently, this court is "constrained to follow Jan's Helicopter as controlling precedent even though it is the later-issued circuit decision."  Briseno, 83 Fed. Cl. at 633 n.5.

before the BCNR, the court must assume that plaintiff seeks the same relief here as he sought before the BCNR; namely, a return to active duty and the submission of his MEB package to the PEB for a fitness determination.  See AR Vol. I at 14-15.  Indeed, plaintiff seeks this very remedy in his amended complaint's prayer for relief.  See Am. Compl. § V.  However, despite a literal reading of plaintiff's complaint, the court cannot conclude that plaintiff is seeking to have the BCNR, in lieu of the PEB, make a fitness finding in the first instance.  See id. ¶ 27 (alleging that the BCNR should have corrected his "military records to reflect that he was unfit for duty at the date [of] discharge").  Upon reviewing the administrative record and plaintiff's opposition to defendant's motions, it is clear to the court that plaintiff's claim is based upon a misreading of the BCNR's April 2, 2001 decision.  Plaintiff attributes the conclusion of the Director of the Naval Council of Personnel Boards that plaintiff was fit for duty at the time of his separation to the BCNR.  Pl.'s Opp'n Def.'s Mot. Dismiss, or Alternative, J. Administrative R. ("Opp'n") 22 (quoting the October 24, 2000 advisory opinion but attributing it to the BCNR), 25 ("[T]he BCNR did not have substantial evidence for its decision that [plaintiff] was fit for duty at the time of his discharge."), 26-27 (describing the contents of the advisory opinion as the "comments and recommendations" of the BCNR), 30 ("[T]he BCNR ruled on [plaintiff]'s fitness for duty.").  Although the BCNR "substantially concurred with the comments contained in the advisory opinion," it did not expressly adopt the advisory opinion's fitness finding; indeed, the BCNR did not expressly adopt any of the findings in the advisory opinion.  AR Vol. I at 1.  Thus, as the court construes plaintiff's complaint, plaintiff is alleging only that the BCNR should have corrected his military records to reflect a return to active duty so that the PEB could make a fitness determination.[14]

Having so identified plaintiff's claim, the court turns to the three statutes advanced by plaintiff as the basis for this court's jurisdiction.  To begin, 28 U.S.C. § 1491 is not independently money-mandating.  Testan, 424 U.S. at 398.  Rather, the substantive right to money damages must be found in another source of law.  Loveladies Harbor, Inc., 27 F.3d at 1554.  It is well-established that 37 U.S.C. § 204(a)(1), which entitles military service members to basic pay while on active duty, is such a source.  Metz v. United States, 466 F.3d 991, 998 (Fed. Cir. 2006) (citing In re United States, 463 F.3d 1328, 1334 (Fed. Cir. 2006); James v. Caldera, 159 F.3d 573, 581 (Fed. Cir. 1998)).  Defendant contends, however, that although 37 U.S.C. § 204(a)(1) is money-mandating, "it does not provide the remedy that plaintiff is seeking in this case" because it only provides for relief when a service member is "unlawfully discharged

_____

    [14]  For this reason, 10 U.S.C. § 1201 (2000 & Supp. IV 2005), while money-mandating, Fisher, 402 F.3d 1174-75, does not provide a basis for jurisdiction in this case.  Although plaintiff requests back disability retirement pay in his amended complaint, such relief is unavailable based on the claim asserted by plaintiff.  Further, as explained in more detail below, any entitlement to disability retirement pay would require: (1) a return to active duty; (2) a determination by the PEB that plaintiff was unfit for duty; (3) a decision by the Navy to defer plaintiff's mandatory separation; and (4) a decision by the Navy to retire plaintiff for disability.  The connection between the first and last requirements is too attenuated for plaintiff to obtain an award of disability retirement pay from this court under the present circumstances.

and he is entitled to pay that he would have received but for the unlawful discharge." Def.'s Renewed Mot. J. Administrative R. 17-18 (citing <u>Martinez v. United States</u>, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc)).  Defendant's citation to <u>Martinez</u> is unpersuasive.

      In <u>Martinez</u>, the service member was separated from active duty in February 1992 upon being found guilty of certain charges under Article 15 of the Uniform Code of Military Justice. 333 F.3d at 1299.  After the correction board rejected his application to, among other things, expunge the Article 15 proceeding from his records and restore him to active duty in August 1995, he filed suit in the Court of Federal Claims in August 1998.  <u>Id.</u> at 1300.  The Federal Circuit noted, as a preliminary matter, that a plaintiff in a military discharge case "must allege that, because of the unlawful discharge, the plaintiff is entitled to money in the form of the pay that the plaintiff would have received but for the unlawful discharge."  <u>Id.</u> at 1303.  However, because its analysis was squarely focused on whether the six-year statute of limitations barred plaintiff's action, <u>id.</u> at 1302-19, the Federal Circuit did not address whether the apparent lawful nature of the service member's separation foreclosed its exercise of jurisdiction pursuant to 37 U.S.C. § 204(a)(1).  Thus, defendant's attempt to apply the statement in <u>Martinez</u> to the instant case as a bar to jurisdiction must fail.

      Further, had the Federal Circuit considered whether the apparent lawful nature of the service member's separation foreclosed Tucker Act jurisdiction, this court is confident that the Federal Circuit would have found the proposition wanting.  If the Court of Federal Claims' jurisdiction pursuant to 37 U.S.C. § 204(a)(1) was limited to those cases where a service member's discharge or separation was not accomplished pursuant to a statute or regulation, then all service members seeking back pay would be foreclosed from bringing suit in the Court of Federal Claims because the military does not separate or discharge its members in the absence of a statute or regulation permitting the separation or discharge.  <u>See</u> MILPERSMAN § 3830220(1) ("Termination may be accomplished only through a specific legally authorized process.").  The Federal Circuit rejected a similar contention by the government in <u>Fisher</u>:

> According to the Government, [10 U.S.C.] § 1201 is money-mandating only for service members who qualify for benefits under the statute, i.e., those members who have been found by the Secretary to be unfit for duty.  But that understanding turns the law on its head–according to the Government the only persons entitled to judicial relief are those who do not need it because they were awarded disability status; those who were denied that status cannot get relief because they were denied what they sought.
>
>       Such a perverse understanding of Congress's purpose cannot be the law; it is inconsistent with the literal language of the statute and with our construction of the statute . . . .  The fact that the statute imposes requirements for the payment of money does not mean that only claimants who have been determined by a Government official to meet those requirements have a right to the money the statute provides.  It is the statute, not the Government official, that provides for

-16-

> the payment.  If the Government official's determinations under the statute are in
> error, the court is there to correct the matter, and to have the proper
> determinations made.

402 F.3d at 1175 (panel portion).  Applying the panel's logic in <u>Fisher</u> to the instant case, it is
apparent that defendant is contending that "the only persons entitled to relief are those who do
not need it" because they were lawfully discharged and that those who were not lawfully
discharged "cannot get relief because they were denied what they sought"–a lawful discharge.
The court declines to endorse this view.  Although the Navy separated plaintiff pursuant to
existing statutory and regulatory prescriptions, plaintiff challenges the propriety of the separation.
Thus, plaintiff alleges that his discharge was unlawful and seeks, as prescribed by 37 U.S.C.
§ 204(a)(1), back pay incident to a return to active duty (for a fitness determination by the PEB).
The court possesses jurisdiction over this claim.  Moreover, application of the en banc portion of
<u>Fisher</u>–along with <u>Jan's Helicopter Service, Inc.</u>–leads to the same result.  All that plaintiff must
assert is a money-mandating statute and a nonfrivolous claim that he is within the class of
plaintiffs entitled to recover under the money-mandating statute.  Section 204(a)(1) is money-
mandating and plaintiff, if he prevails on the merits, is entitled to recover under it.

Finally, plaintiff cites 10 U.S.C. § 1552, the statute providing for the correction of
military records, as a jurisdictional basis for his claim.  In particular, section 1552(c) provides:

> The Secretary concerned may pay, from applicable current appropriations, a claim
> for the loss of pay, allowances, compensation, emoluments, or other pecuniary
> benefits . . . if, as a result of correcting a record under this section, the amount is
> found to be due the claimant on account of his . . . service in the . . . Navy . . . .

10 U.S.C. § 1552(c).  As the Federal Circuit noted in <u>Martinez</u>, "even though section 1552
mandates the payment of money if the correction board concludes that the service member's
discharge was unlawful, section 1552 is not the 'money-mandating' statute that gives rise to the
cause of action that provides the basis for a Tucker Act suit in the Court of Federal Claims."  333
F.3d at 1315; <u>see also</u> <u>id.</u> at 1315 n.4 (noting that 10 U.S.C. § 1552 can be money-mandating in
the following circumstances: (1) "if the plaintiff should have been retired for disability but the
Correction Board illegally failed to so find" or (2) "when the correction board has granted relief
and the service member seeks to enforce or challenge the implementation or scope of the
remedial order").  Thus, 10 U.S.C. § 1552 would provide jurisdiction in this case only if the court
concludes that the BCNR should have corrected plaintiff's military records to reflect that plaintiff
was unfit for duty at the time of his separation and was therefore entitled to disability retirement
pay.

## III.  DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

### A.  Standard of Review

In addition to its motion to dismiss, defendant filed two motions for judgment on the administrative record pursuant to RCFC 52.1, seeking to uphold the BCNR's April 2, 2001 decision declining to correct plaintiff's military record.  In ruling on a motion for judgment on the administrative record, the court makes "factual findings . . . from the record evidence as if it were conducting a trial on the record."  Bannum, Inc. v. United States, 404 F.3d 1346, 1357 (Fed. Cir. 2005);[15] see also id. at 1356 ("[J]udgment on the administrative record is properly understood as intending to provide for an expedited trial on the administrative record.").  The court's review in military pay cases is not limited to the administrative record but may also encompass de novo evidence.  Bray v. United States, 515 F.2d 1383, 1390 (Ct. Cl. 1975) (per curiam); Beckham v. United States, 375 F.2d 782, 785 (Ct. Cl. 1967).  However, "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'"  Axiom Res. Mgmt., Inc., 564 F.3d at 1380 (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)).

The BCNR's decision was authorized by 10 U.S.C. § 1552 (2000) and 32 C.F.R. § 723.2(b) (2000), which allow for the correction of military records "to correct an error or remove an injustice."  The decisions of the BCNR are entitled to deference.  Bray, 515 F.2d at 1391; see also Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (noting that a court is not to substitute its judgment for that of the correction board "when reasonable minds could reach differing conclusions on the same evidence").  Accordingly, the court "will not disturb the decision of [a] corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence."  Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005); accord Bray, 515 F.2d at 1391.

Specifically, in this case, plaintiff argues first that the Navy violated its own regulations in separating him on March 15, 1999, without a fitness determination from the PEB.  Opp'n 27-29.  As with other military decisions, the determination of a member's fitness to serve is within the province of the military and is entitled to deference.  Fisher, 402 F.3d at 1176-77; Heisig, 719 F.2d at 1156.  However, "[a] court may decide whether the military has complied with procedures set forth in its own regulations because those procedures by their nature limit the military's discretion."  Fisher, 402 F.3d at 1177.  In rendering such a decision, the court applies the facts of the case to the applicable statutes and regulations.  Adkins v. United States, 68 F.3d

---

[15]  The decision in Bannum was based upon RCFC 56.1, which was abrogated and replaced by RCFC 52.1.  RCFC 52.1, however, was designed to incorporate the decision in Bannum.  See RCFC 52.1, Rules Committee Note (June 20, 2006).

1317, 1323 (Fed. Cir. 1995) (citing Murphy v. United States, 993 F.2d 871, 874 (Fed. Cir. 1993)).

Second, plaintiff argues that the BCNR's April 2, 2001 decision was not supported by substantial evidence.  Opp'n 22-27.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951), quoted in Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).  To determine whether substantial evidence supports a decision, "[a] reviewing court must consider the record as a whole, including that which 'fairly detracts from its weight' . . . ."  Nippon Steel Corp., 458 F.3d at 1351 (quoting Universal Camera Corp., 340 U.S. at 488).  However, the court must "bear in mind that '[e]xaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, imprecision, and errors detract from the weight to be accorded the evidence upon which an administrative board bases its decision.'"  Dixon v. Dep't of Transp., FAA, 8 F.3d 798, 804 (Fed. Cir. 1993) (quoting Spurlock v. Dep't of Justice, 894 F.2d 1328, 1330 (Fed. Cir. 1990)).  The court is not to reweigh the evidence, but instead must look to see if exaggeration, improbability, self-contradiction, omissions, imprecision, or errors "detract from the weight of that particular evidence."  Id.  If the detraction is of such a magnitude that "a reasonable fact-finder would not find the charge proved by a preponderance of evidence," id., or if the court "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view," Universal Camera Corp., 340 U.S. at 488, the court may set aside the decision.

## B.  Applicable Statutory and Regulatory Framework

Prior to addressing the merits of defendant's motions, a review of the statutes and regulations applicable to plaintiff's circumstances is appropriate.

### 1.  Promotion, Separation, and Retirement of Naval Officers

As previously noted, plaintiff was commissioned as an officer in the Naval Reserve on September 25, 1987, and, after four years of service, was promoted to the rank of lieutenant on October 1, 1991.  See 10 U.S.C. § 619(a)(1) (1988) (containing the time-in-grade requirements for promotion to the ranks of lieutenant (junior grade) and lieutenant in the Navy).  After the requisite time-in-grade, see id. § 619(a)(2), naval lieutenants may be recommended for promotion by a selection board convened for that purpose, see id. § 611(a), 619(b)(1).  A naval lieutenant who has failed to be selected for promotion once remains eligible for promotion.  Id. § 619(b)(1).  However, if a naval lieutenant is not selected for promotion a second time and is not recommended for promotion, the lieutenant loses his or her promotion eligibility.  Id. § 619(b)(2).  In such a case, the lieutenant must be separated from the Navy:

> [E]ach officer of the Regular Navy who holds the regular grade of lieutenant or
> lieutenant commander, who has failed of selection for promotion to the next

higher regular grade for the second time and whose name is not on a list of officers recommended for promotion to the next higher regular grade shall–

> (1) be discharged . . . not later than the first day of the seventh calendar month beginning after the month in which the President approves the report of the board which considered him for the second time;

> (2) if he is eligible for retirement under any provision of law, be retired under that law . . . not later than the first day of the seventh calendar month beginning after the month in which the President approves the report of the board which considered him for the second time; or

> (3) if on the date on which he is to be discharged under clause (1) he is within two years of qualifying for retirement . . . , be retained on active duty until he is qualified for retirement and then retired . . . , unless he is sooner retired or discharged under another provision of law.

10 U.S.C. § 632(a) (1994 & Supp. III 1998); accord SECNAVINST 1920.6A, enclosure (3), ¶ 3(a)(2) (Mar. 17, 1993). "The retirement or discharge of an officer pursuant to" section 632 is "considered to be an involuntary retirement or discharge for purposes of any other provision of law." 10 U.S.C. § 632(b).

Other provisions of law in which a naval officer may be retired include 10 U.S.C. § 1201 (1994 & Supp. IV 1999). As noted above, section 1201 allows the military to retire a service member if he or she "is unfit to perform the duties of the member's office, grade, rank, or rating because of a physical disability incurred while entitled to basic pay . . . ." 10 U.S.C. § 1201(a). Moreover, the Secretary of the Navy:

> may defer the retirement or separation under [title 10 of the United States Code] of any officer if the evaluation of the physical condition of the officer and determination of the officer's entitlement to retirement or separation for physical disability require hospitalization or medical observation that cannot be completed before the date on which the officer would otherwise be required to retire or be separated under [title 10].

Id. § 640. Indeed, as noted above, "[o]fficers in receipt of separation orders who need hospitalization or treatment or in whose cases a report of a medical board, or a physical evaluation board is pending will not be separated nor transferred for separation without specific direction of [the Chief of Naval Personnel]." MILPERSMAN § 3830240(1)(b).

## 2. The Navy's Disability Evaluation System

Prior to separation from the Navy, a member must undergo a physical examination. <u>See</u> Oral Argument Tr. 37, Apr. 6, 2006 ("There is a requirement that members . . . [,] prior to being separated from the military service or when such separation is contemplated, . . . get a physical evaluation."). The separation physical examination may result in the convening of an MEB. <u>See, e.g.</u>, SECNAVINST 1850.4D, § 1009 (indicating that referral to the PEB should be done "as soon as it has been ascertained that return to full duty is unlikely, and optimal medical treatment benefits have been attained"). However, "elective, surgical procedures that may affect a member's physical qualification for duty" should be completed "before initiation of a Medical Board." <u>Id.</u> § 3206(a).

### a. Convening a Medical Evaluation Board

An MEB is "[a] body of physicians . . . convened in accordance with [the Manual of the Medical Department] to identify members whose physical . . . qualification to continue on full duty is in doubt or whose physical . . . limitations preclude their return to full duty within a reasonable period of time." <u>Id.</u> § 2042. MEBs "may be convened by commanding officers and officers in charge of naval hospitals and other [medical treatment facilities] designated by the Chief, Bureau of Medicine and Surgery" or "may be ordered by" the Chief of Naval Operations, the Chief of Naval Personnel, or the Chief of Bureau of Medicine and Surgery. <u>Id.</u> § 3104(b).

Because it is not Navy policy "to retain members on active duty . . . to provide prolonged, definitive medical care when it is unlikely the member will return to full military duty," it is the responsibility of "line commanders, commanding officers of [medical treatment facilities,] and individual medical and dental officers [to] promptly identify for evaluation by Medical Boards . . . those members presenting for medical care whose physical . . . fitness to continue naval service is questionable." <u>Id.</u> § 1005; <u>cf. id.</u> § 3106 ("Commanding officers of [medical treatment facilities] and individual medical and dental officers are to identify promptly for referral to the [Naval Disability Evaluation System] those members presenting for medical care whose Fitness for active duty is questionable."). "Any condition that appears to significantly interfere with performance of duties . . . will be considered for MEB evaluation." <u>Id.</u> § 8001(e). Included among those conditions are "[i]nternal derangement of the knee when there is residual instability following remedial measures such as surgery or physical therapy," <u>id.</u> § 8002(b)(5), and "[s]pondylolysis and/or [s]pondylolisthesis requiring fusion with loss of mobility," <u>id.</u> § 8002(j)(2)(b). However,

the presence of the condition alone is often not a criteria for submission of a[n] MEB report–the member must have been tried on appropriate courses of medication (and proper use of [limited duty] status), been unresponsive to them,

required untoward number of visits for medical care or hospitalizations and, just as importantly, the condition must be Unfitting.

Id. § 8001(g).

### b. Actions by the Medical Evaluation Board

After receiving a case, MEBs "evaluate and report on the diagnosis; prognosis for return to full duty; plan for further treatment, rehabilitation, or convalescence; estimate of the length of further disability; and medical recommendation for disposition of such members." Id. § 2042.  If the MEB finds that a "member's Fitness for continued active service [is] questionable," id. § 3201(a), "because the member's condition most likely is permanent, and/or any further period of temporary limited duty (TLD) is unlikely to return the member to full duty,"[16] id. § 3102(a), it will prepare a report and refer the case to the PEB, id. §§ 3102(a)-(b), 3201(a).  However, an MEB report should not be forwarded to the PEB if the member "is being processed for separation or retirement for reasons other than physical disability, unless . . . the member's physical condition reasonably prompts doubt that he or she is Fit to continue to perform" his or her duties. Id. § 3202(g).  Normally, the MEB should ensure that its report is received by the PEB within thirty days of the report's dictation.[17]  See Department of Defense Instruction 1332.38, § E3.P1.6.2.1 (Nov. 14, 1996) ("When a physician initiates a[n] MEB, the processing time

---

[16]  "A condition is considered permanent when the nature and degree of the condition render the member unable to continue naval service within a reasonable period of time (normally 12 months or less)."  SECNAVINST 1850.4D, § 3102(a).

[17]  By starting the thirty-day clock at the date that the MEB report was dictated, the Department of Defense regulation provides more leeway than the Navy regulation meant to implement the Department of Defense regulation.  The Navy regulation provides that absent "unusual circumstances," SECNAVINST 1850.4D, § 1009, an MEB report that refers a member to the PEB must be "processed, dictated, and received by the PEB within 30 days of the attending physician's desire to convene a medical board," id. § 1009(a).  The court gives precedence to the Department of Defense regulation.  See Hoskins v. United States, 40 Fed. Cl. 259, 273 (1998) ("'Department of Defense regulations control when they conflict with regulations promulgated by the Air Force.'" (quoting Poole v. Rourke, 779 F. Supp. 1546, 1565 (E.D. Cal. 1991))); Casey v. United States, 8 Cl. Ct. 234, 239 (1985) ("To the extent that Army regulations conflict with those of the Department of Defense, the service regulations must give way."); see also Layman v. Harvey, No. 8:05-cv-2208-T-24-EAJ, 2007 WL 430678, at *8 n.8 (M.D. Fla. Feb. 5, 2007) ("The Army contends that Department of Defense directives are controlling over the Department of Defense instructions and Army regulations.  Since DODD 1332.38 authorizes the procedures for the instructions set forth in DODI 1332.28 regarding the disability evaluation system, this contention has merit.  Moreover, Layman does not cite to any authority contradicting the Army's position.").

should normally not exceed 30 days from the date the MEB report is dictated to the date it is received by the PEB.").

The MEB report "shall make a clear statement" of the MEB's "opinion that the member's condition does or does not render the member 'unable to continue naval service by reason of physical impairment.'" SECNAVINST 1850.4D, § 3901(a). The MEB's "opinion must be supported by objective medical data displaying the nature and degree of the impairment, if any." Id.; accord id. § 3201(a). In addition, the MEB must "comprehensively describe the physical condition of a member" and "the nature and extent of the physical impairments . . . ." Id. § 3901(a). The MEB report must include (1) "the results of a complete medical physical examination"; (2) "all available information," properly authenticated, concerning "aggravation by service"; (3) "other significant facts pertaining to the impairments"; and (4) a nonmedical assessment. Id. The MEB is prohibited from making a finding of unfitness in its report, as such a conclusion is within the sole province of the PEB. Id. § 3901(c). Members are entitled to receive a copy of the MEB report, "be counseled regarding the opinions and recommendations of the medical board," discuss the "opinions and recommendations with each member of the MEB," and "submit a statement regarding any portion of the MEB report." Id. § 3208(a).

### c. Physical Evaluation Boards

The PEB accepts a case referred by an MEB when it has received "all medical and non-medical information necessary to evaluate the case appropriately . . . ." Id. § 3102(b); see also id. § 3203 (describing the circumstances, none of which appear to be relevant to the case at bar, in which the PEB may defer or reject a case). Nonmedical information may include "an assessment of the member's performance of duty by his or her chain of command," which "may provide better evidence of the member's ability to perform his or her duties than a clinical estimate by a physician." Id. § 3205(a). Nonmedical information may also include "[p]ertinent personnel records." Id. § 3205(b)(4). The PEB will only consider the cases of those members who suffer from a condition that constitutes a physical disability. Id. § 3401; see also id. §§ 8001-8016 (describing the "medical conditions and physical defects which normally are cause for referral to the physical evaluation board"). "If a member is pending mandatory separation or retirement, such retirement or separation may only be deferred if the member is hospitalized or a medical board report has been accepted by the President, PEB for disability evaluation processing. 10 U.S.C. 640 applies." Id. § 3710.

Upon accepting a case, the "Informal PEB conducts a record review" and makes preliminary findings. Id. § 3102(b); accord id. §§ 4201, 4208. The PEB notifies the member of the preliminary findings and the member has fifteen days in which to accept or reject the findings. Id. § 3102(b); accord id. §§ 4213-4214. If the member accepts the findings or does not respond within fifteen days, the "case is finalized and service headquarters is requested to make an appropriate disposition . . . ." Id. § 3102(b); accord id. §§ 4213(a)(1), (b)(1), (c)(1), (d)(1), 4214(e), 4215-4216. If the member rejects the findings, "the member can request reconsideration of that decision by the same Informal PEB and/or demand/request a personal appearance before a

Formal PEB." Id. § 3102(b); accord id. §§ 4213(a)(2), (b)(2), (c)(2), (d)(2), 4313. "If the Formal PEB hears a case, it makes findings, and, subsequent to legal review and/or quality assurance review[,] findings are sent to the member . . . ." Id. § 3102(b); accord id. §§ 4329-4330, 4336. Once again, if the member accepts the findings, an appropriate disposition is made. Id. § 3102(b). However, if the member rejects the findings, he or she may petition the Director of the Naval Council of Personnel Boards within fifteen days. Id.; accord id. §§ 4336(b)(1), (3), 4338, 5001-5006. Further, at any time after a final decision has been reached, a member may petition the BCNR. Id. § 3102(b); accord id. §§ 4336(b)(1), 4338.

The PEB uses only one standard in determining whether a member should be separated or retired due to physical disability: "Unfitness to perform the duties of office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to basic pay." Id. § 3301; accord id. § 3306(b). "A service member shall be considered Unfit when the evidence establishes that the member, due to a physical disability, is unable to reasonably perform" his or her duties. Id. § 3302(a). Once a service member is declared to be unfit by the PEB, the PEB will either place the member on the permanent disability retired list, place the member on the temporary disability retired list, or retain the member on permanent limited disability. Id. §§ 3702, 3705-3706, 3708, 6001-6011.

## C.  Discussion

In its April 2, 2001 decision, the BCNR concluded: "After careful and conscientious consideration of the entire record, the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice." AR Vol. I at 2. Specifically, it found that (1) because plaintiff did not have the "right to be retained on active duty," the Navy's failure to defer plaintiff's mandatory separation was not "erroneous" and (2) it was "not persuaded" that the Navy's failure to defer plaintiff's mandatory separation was "unjust." Id. The court addresses each finding in turn.

## 1.  The BCNR's Determination That Plaintiff Did Not Have the "Right to Be Retained on Active Duty" Was Not Contrary to Law

The BCNR is empowered to correct military records when it is "necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a). Thus, the BCNR can consider whether the Navy has acted unlawfully. In the instant case, the BCNR found no legal error in the Navy's treatment of plaintiff, a conclusion that is reviewable by the Court of Federal Claims. See Fisher, 402 F.3d at 1177. In considering whether the Navy complied with the procedures set forth in the relevant statutes and regulations, the court is faced with three distinct inquiries. First, was it proper for the Navy to forward the MEB package to the PEB? Second, should the PEB have accepted the MEB package? Third, was the Navy required to postpone plaintiff's mandatory separation pending the resolution of plaintiff's disability evaluation? Although the court answers the first two questions in the affirmative, it is the court's negative response to the third question that is dispositive on this issue.

As an initial matter, Navy regulations prohibit the referral of an MEB report to the PEB if the member "is being processed for separation or retirement for reasons other than physical disability, unless . . . the member's physical condition reasonably prompts doubt that he or she is Fit to continue to perform" his or her duties.  SECNAVINST 1850.4D, § 3202(g).  There is ample evidence in the record that plaintiff was experiencing, among other things, increasing pain in his right knee and back at the time of his separation physical examination.  As a result, his physicians felt it necessary to convene an MEB, even in light of regulations requiring the attainment of optimal treatment benefits before the convening of an MEB.[18]  See id. § 1009. And, although the MEB report contained the recommendation that plaintiff remain on active duty, it also included a referral of plaintiff's case to the PEB.  Accordingly, it is clear that plaintiff's physicians and other responsible naval personnel had doubts about plaintiff's fitness for continued duty.  Therefore, the record demonstrates that the Navy's referral of plaintiff for disability evaluation by the PEB–with full awareness of plaintiff's impending mandatory separation–was proper.

The court's next inquiry is whether, given plaintiff's referral to the PEB, the PEB should have accepted plaintiff's MEB package.  Navy regulations indicate that the PEB accepts a case referred by an MEB when it has received "all medical and non-medical information necessary to evaluate the case appropriately . . . ."  Id. § 3102(b).  The PEB received plaintiff's mailed MEB package on March 2, 1999, and there is no evidence in the record that the package did not contain all of the required information or that the PEB, at that time, believed that the package lacked the required information.  Although plaintiff was in possession of mandatory separation orders requiring his discharge by midnight on March 1, 1999, he was not discharged.  See MILPERSMAN § 3830240(1)(b) (requiring the Chief of Naval Personnel to specifically authorize a separation of an officer in possession of mandatory separation orders who has a pending MEB or PEB).  Thus, when the PEB received plaintiff's MEB package in the mail, plaintiff was on active duty.  Accordingly, the PEB should not have declined to accept plaintiff's MEB package on untimeliness grounds.[19]  Moreover, there is evidence in the record suggesting that the PEB received plaintiff's MEB package via facsimile prior to midnight on March 1, 1999. Defendant has failed to cite any statute or regulation that prohibits the PEB from accepting an MEB package by facsimile.  See also Oral Argument Tr. 49 (containing Navy counsel's assertion

_____

[18]  It is not the proper role of the court to question the medical judgment of plaintiff's physicians in a record review case.

[19]  Defendant suggests that the PEB would still have rejected plaintiff's MEB report pursuant to section 3206 of SECNAVINST 1850.4D.  See Def.'s Supplemental Mem. Supp. Its Mot. Dismiss, or, Alternative, J. Upon Administrative R. 1.  This suggestion lacks merit. Subsection 3206(a) indicates that an MEB should not be convened until elective surgery has been completed, but does not require, or even suggest, that an MEB convened in apparent disregard of this provision be rejected by the PEB.  And, subsection 3206(b) applies to cases that are already pending before the PEB, not to the initial intake of cases.

that he was "not aware of any regulation that says that the PEB could not have accepted a fax"). Therefore, had the PEB received plaintiff's MEB package via facsimile prior to plaintiff's mandatory separation–whether it had occurred on March 1, 1999, as originally scheduled, or on March 15, 1999–it should have accepted it.  In sum, absent any evidence in the record of barriers to the PEB's acceptance of plaintiff's MEB package, the court concludes that the PEB should have accepted it.

The court's third inquiry concerns the consequences of the PEB's presumed acceptance of the MEB package on plaintiff's preexisting mandatory separation orders.  As noted above, Navy lieutenants who have been twice passed over for promotion must be separated.  10 U.S.C. § 632(a).  However, if such a lieutenant "is eligible for retirement under any provision of law," he or she should "be retired under that law . . ."  Id.  In plaintiff's case, the Navy had initiated the process of evaluating plaintiff for a disability by referring his case to the PEB.  Had the PEB determined that plaintiff was unfit for duty, plaintiff would have been eligible to be retired due to physical disability.  Id.  However, the decision to retire a member for disability is within the Navy's discretion.  Id. § 1201(a) ("Upon a determination by the Secretary concerned that a member . . . is unfit to perform [his or her] duties . . . because of physical disability . . . , the Secretary may retire the member." (emphasis added)).  Moreover, the decision to postpone a mandatory separation pending a fitness/disability determination is also committed to the Navy's discretion.  Id. § 640 ("The Secretary of the military department concerned may defer the retirement or separation . . . of any officer if the evaluation of the physical condition of the officer and determination of the officer's entitlement to retirement or separation for physical disability require hospitalization or medical observation that cannot be completed before the date on which the officer would otherwise be required to retire or be separated . . . ." (emphasis added));  SECNAVINST 1850.4D, § 3710 (noting that "[i]f a member is pending mandatory separation or retirement, such retirement or separation may only be deferred if the member is hospitalized or" the PEB has accepted an MEB report (emphasis added)); cf. MILPERSMAN § 3830240(1)(b) (requiring the Chief of Naval Personnel to specifically authorize a separation of an officer in possession of mandatory separation orders who had a pending MEB or PEB, but not preventing the Chief of Naval Personnel to provide the required authorization on the preexisting mandatory separation date).  Accordingly, regardless of whether or not the PEB had accepted plaintiff's MEB package, the Navy was entitled to separate plaintiff pursuant to 10 U.S.C. § 632.  The BCNR's determination that plaintiff had no "right to be retained on active duty" was therefore not arbitrary, capricious, or contrary to law.

## 2.  The Court Remands the Case to the BCNR

### a.  The BCNR's Decision Is Inadequate

Because plaintiff did not possess right to be retained on active duty, the court construes the complaint as alleging an injustice, not a legal error.  The BCNR is empowered to remove an injustice from a service member's military records.  10 U.S.C. § 1552(a).  In fact, it is well-established that the BCNR has "an abiding moral sanction to determine, insofar as possible, the

true nature of an alleged injustice and to take steps to grant thorough and fitting relief." Caddington v. United States, 178 F. Supp. 604, 607 (Ct. Cl. 1959); accord Roth v. United States, 378 F.3d 1371, 1381 (Fed. Cir. 2004). In essence, plaintiff contends that principles of justice required the Secretary of the Navy to exercise his discretion under 10 U.S.C. § 640 and SECNAVINST 1850.4D, § 3710 to defer plaintiff's mandatory separation pending a review of plaintiff's case by the PEB. However, the BCNR "found that the evidence submitted was insufficient to establish the existence of probable . . . injustice" and indicated that it was "not persuaded" that the Navy's failure to defer plaintiff's mandatory separation was "unjust."[20]

In rendering its decision on plaintiff's application, the BCNR was "bound by its own regulations." Beckham v. United States, 392 F.2d 619, 622 (Ct. Cl. 1968). The pertinent regulations required the BCNR to "make written findings, conclusions and recommendations." 32 C.F.R. § 723.6(a)(3). Moreover, because the BCNR denied plaintiff's application without a hearing, it was required to include in its written determination a "brief statement of the grounds for denial," id. § 723.3(e)(3), that, in turn, contained "the reasons for the determination that relief should not be granted . . . together with all the essential facts upon which the denial [was] based," id. § 723.3(e)(4). Although a "presumption of regularity . . . attaches" to the BCNR's decision, Richey v. United States, 322 F.3d 1317, 1326 (Fed. Cir. 2003), "[a] naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing . . . is inimical to a rational system of administrative determination and ultimately inadequate," Beckham, 392 F.2d at 622-23. The BCNR is not required to explain the reasons for its decision "in great detail," but must provide an applicant with "sufficient notification . . . to permit him, if he may, to rebut [its] action." Craft v. United States, 544 F.2d 468, 474 (Ct. Cl. 1976).

Here, in its brief decision, the BCNR made two specific findings that might conceivably support its conclusion that there was no injustice in plaintiff's case. First, it found that the Navy's failure to defer plaintiff's mandatory separation was not unlawful. However, while an action may be, in fact, in accordance with black-letter law, it may nevertheless lead to a harsh, unfair, or inequitable result. In other words, although the lawfulness of an action may support its justness, that attribute is not the only factor that contributes to a justness analysis. Indeed, according to the law of this circuit, in cases such as this one, the determination of whether an action is just is separate and distinct from whether the action is lawful: "The Board is to recommend action to correct 'error' or 'injustice,' 10 U.S.C. § 1552. The two things are not the same. 'Error' means legal or factual error. . . . 'Injustice,' when not also 'error,' is treatment by the military authorities, that shocks the sense of justice, but is not technically illegal." Reale v. United States, 208 Ct. Cl. 1010, 1011 (1976). Second, the BCNR found that there was no "inordinate delay in the processing of [plaintiff's] case by naval medical authorities . . . ." However, it did not explain how this finding is relevant to the justness of the Navy's failure to

---

[20] The court interprets the BCNR's characterization of the relief requested by plaintiff–deferral of plaintiff's mandatory separation–as encompassing plaintiff's request that he be placed on active duty while the PEB consider his MEB package.

defer plaintiff's mandatory separation pending a fitness evaluation.[21]  In other words, the BCNR did not explain how plaintiff's separation was less of an injustice due to the lack of an "inordinate delay."  Moreover, in addition to these two specific findings, the BCNR averred that it "substantially concurred with the comments contained in the advisory opinion."  However, it did not indicate how those "comments" supported its conclusion that the Navy's decision not to defer plaintiff's mandatory separation was not an injustice.

Because of these deficiencies, the court finds that the BCNR did not provide the required "reasons for the determination that relief should not be granted . . . together with all the essential facts upon which the denial [was] based," 32 C.F.R. § 723.3(e)(4), to support its conclusion that the Navy's decision to discharge plaintiff on March 15, 1999, without a completed fitness evaluation by the PEB was just.  The BCNR's decision, on its face, does not enable plaintiff to ascertain the rationale for or the factual basis of the BCNR's determination.  The court's conclusion finds support in at least three cases from the United States Court of Claims ("Court of Claims").

In Versaci v. United States, there was "a long history and consistent record of obviously well-grounded unanimous medical opinion"–from four MEBs, two PEBs, and one Physical Review Council–that the plaintiff was unfit for duty.  403 F.2d 246, 255-56 (Ct. Cl. 1968).  However, a second Physical Review Council, on the same record, reached the opposite conclusion without "any explanation or analysis."  Id. at 256.  The Court of Claims opined that "[s]uch a determination, 'conclusionary in nature,' making it impossible to 'determine what weight was given to the evidence,' and which does not 'discuss the details or specify precisely what items of evidence were considered,' [could not] be sustained."  Id. (quoting Smith v. United States, 168 Ct. Cl. 545, 552 (1964)).  Indeed, the court noted that any "efforts to appraise the reasoning upon which [the determination] was based or the motivation behind it would result only in speculation."  Id.

---

[21]  As an aside, the court notes that the BCNR's finding that there was no "inordinate delay," regardless of its relevance to the justness inquiry, is supported by substantial evidence.  There is an abundance of evidence in the record describing the amount of time that lapsed between plaintiff's referral for disability evaluation and the dictation of the MEB report (i.e., between January 20, 1999, and February 10, 1999) and the length of time between the date that plaintiff's MEB package was ready for mailing and the date that the package was actually mailed (i.e., between February 19, 1999, and March 1, 1999).  Although the court understands plaintiff's urgency in having the PEB receive his MEB package as soon as possible, forty days is not an unreasonable length of time for the process to occur.  Moreover, as previously noted, Department of Defense regulations specify that the PEB should receive an MEB report within thirty days of the MEB report's dictation.  See Department of Defense Instruction 1332.38, § E3.P1.6.2.1.  In plaintiff's case, Dr. Rooney dictated the MEB report on February 10, 1999, and the MEB package was received by the PEB no later than March 2, 1999–a twenty-day time span.  The court finds no fault with this aspect of the BCNR's decision.

The Court of Claims faced a similar factual situation in Craft. In that case, the plaintiff was unwillingly placed in temporary retirement. 544 F.2d at 471. He was subsequently reevaluated for a return to duty by a physician, an MEB, a PEB, and a Physical Review Council. Id. at 471-72. Although the physician and the MEB recommended that the plaintiff be permanently separated from the military, the PEB disagreed, finding the plaintiff to be fit for duty. Id. at 471. In a decision rendered without further explanation, the Physical Review Council reversed the finding of the PEB. Id. at 472. The Court of Claims held that "the failure to provide sufficient reasons affords adequate grounds to negate the actions of the Council." Id. at 473. The court recognized that the Physical Review Council was not required to express the rationale for its decision "in great detail"; rather, all that was required was "sufficient notification to the serviceman to permit him, if he may, to rebut the board's decision." Id. at 474. However, because the Physical Review Council failed entirely to discuss the reasons for its reversal, the plaintiff "was left in the dark as to the unfavorable decision." Id.

The Court of Claims was again faced with an unexplained decision in Buchanan v. United States, 621 F.2d 373 (Ct. Cl. 1980). In that case, the correction board "summarily dismiss[ed] planitiff's appeal by merely stating" that the plaintiff failed to sustain his burden to demonstrate an error or injustice. Id. at 383. Citing Beckham, the court opined:

> It is impossible for us to determine what consideration the correction board gave specific submissions that plaintiff presented to it . . . . The court finds itself unable to determine the basis of the correction board's denial of [the plaintiff's] appeal, since its decision was without any kind of discussion of the evidence presented to it.

Id. The court further held that "[t]he burden that would be placed upon plaintiff in this court would be almost impossible if the correction board were permitted, in these circumstances, to cast aside the issues without discussion or reason and merely state that insufficient evidence has been presented to indicate probable injustice or material error." Id.

As these cases demonstrate, both the applicant to a correction board and a reviewing court are stymied in their ability to address the merits of the correction board's decision when the correction board fails to explain the basis of and rationale for its decision. In the instant case, the deficiencies in the BCNR's decision render it almost useless. It is impossible for plaintiff or the court to evaluate the BCNR's conclusion that an injustice had not occurred.

### b. The Court Is Unable to Determine Whether the Record Supports the BCNR's Conclusion Than an Injustice Had Not Occurred

Because of the deficiencies in the BCNR's written decision, the court must conduct its own inquiry to ascertain whether the decision finds support in the administrative record. See, e.g., Buchanan, 621 F.2d at 383 ("In these circumstances the court is compelled to look at the whole record, without need to accord great weight to the board's determination"); Craft, 544 F.2d

at 474 ("In a particularly egregious situation, the court may be compelled to conduct its own inquiry in order to find record support for the administration decision."); Loral Elecs. Corp. v. United States, 387 F.2d 975, 980 (Ct. Cl. 1967) ("We are compelled to look to the record without much help from the Board's opinion, and therefore without the need to accord as great weight to its determination as we otherwise would."). "In assessing the sufficiency of the rationale for an agency decision, the courts . . . will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned 'by reference to clearly relevant sources other than a formal statement of reasons.'" Dzialo v. United States, 5 Cl. Ct. 554, 563 (1984) (quoting Selman v. United States, 723 F.2d 877, 881 (Fed. Cir. 1983)).

The court turns first to the advisory opinion from the Director of the Naval Council of Personnel Boards, which contained comments with which the BCNR "substantially concurred," without further elaboration. The main issue addressed in the advisory opinion–and the only issue relevant here–was whether plaintiff was fit for duty at the time of his mandatory separation in March 1999. Although the relevance of this issue is not clearly stated in the advisory opinion, the court deduces that if plaintiff was fit for duty at the time of his mandatory separation, then there would have been no reason for the Navy to consider a postponement of plaintiff's mandatory separation. The Director opined that plaintiff was fit for duty at the time of his separation based solely on the following: (1) plaintiff's declaration that he was fit to serve in the Naval Reserve; (2) plaintiff's pursuit of civilian employment prior to his separation; (3) its presumption that plaintiff was able to perform his duties because there was no "Officer's Fitness Report for [plaintiff]'s last eight to nine months on active duty"; and (4) the lack of any indication of "clinical urgency" in plaintiff's medical records. AR Vol. I at 6.

As an initial matter, the court finds that the nexus between the first two facts relied upon by the Director and the Director's fitness opinion is not supported by substantial evidence in the record. The record supports plaintiff's representation in his response to the advisory opinion that he made a declaration about his fitness to serve in the Naval Reserve prior to obtaining the MRI results that indicated that he could not so serve. And, the court finds no rational reason to ascribe any motive to plaintiff's pursuit of civilian employment other than plaintiff wanted to ensure a continued income once he separated from the Navy, whenever that might have been. To infer that plaintiff was fit to serve on active duty because he sought income-producing employment borders on the absurd.

Further, the Director's presumption that plaintiff was able to perform his duties in the third basis for his opinion was based upon a faulty review of the record. Despite the Director's averment to the contrary, the record contains two Fitness Reports and Counseling Records that address the final eight to nine months before plaintiff's mandatory separation (i.e., June or July 1998, through March 1999).[22] The first report, from July 1998, covers the period spanning February 1, 1998, through July 7, 1998. AR Vol. II at 43-44. The second report, from March

---

[22]   Because the full title of each report is "Fitness Report & Counseling Record (E7-O6)," they clearly constitute "Officer's Fitness Reports."

1999, covers the period spanning July 8, 1998, to January 31, 1999. Id. at 45-46. The former report indicates that plaintiff "[s]cored an 'outstanding' on [his] most recent [physical readiness test]." However, the latter report reflects both plaintiff's referral to the PEB and a medical waiver of the physical readiness test.[23] Altogether, the Director misportrayed the record, and by doing so, developed a potentially erroneous presumption about plaintiff's ability to serve. Thus, the presumption relied upon by the Director is not supported by substantial evidence.

Finally, although the Director found no indications of "clinical urgency" in plaintiff's medical records, he fails to substantiate how such "clinical urgency" affects a fitness determination. The court can think of no reason why a gradually progressive knee or back problem–which might be debilitating but not emergent–could not lead to a finding of "unfit." Indeed, Navy regulations clearly provide for such a situation. See SECNAVINST 1850.4D, §§ 8001-8016. Thus, while the court is satisfied that there is substantial evidence in the record of a lack of "clinical urgency," it finds that there is not substantial evidence of the purported nexus between "clinical urgency" and the Director's fitness opinion. Altogether, the court finds the Director's fitness opinion, which was apparently adopted by the BCNR, wholly unsupported by the evidence that he cited. Accordingly, to the extent that the BCNR relied upon the advisory opinion for the conclusion that plaintiff was unfit for duty at the time of his mandatory separation, and that, as a result, there would have been no reason for the Navy to consider a postponement of plaintiff's mandatory separation, the court concludes that such reliance is arbitrary and capricious.

The remainder of the record contains evidence that both supports and detracts from the BCNR's determination that there was no injustice in the Navy's refusal to postpone plaintiff's separation. On the one hand, in plaintiff's favor, the Navy postponed plaintiff's mandatory separation to accommodate his knee surgery; there is evidence that plaintiff may have been unfit for duty at the time of his mandatory separation (e.g., the Navy, pursuant to SECNAVINST 1850.4D, § 3202(g), would not have convened the MEB and forwarded the MEB package to the PEB unless plaintiff's physical condition "reasonably prompt[ed] doubt that he . . . [was] Fit to continue to perform" his duties); and the PEB was not justified in declining to accept plaintiff's MEB package for untimeliness. On the other hand, in the Navy's favor, plaintiff's separation was legally justified and there is evidence that plaintiff was fit for duty at the time of his mandatory separation (e.g., the failure to place plaintiff on limited duty and indications that plaintiff was adequately performing his duties).

In making a determination concerning the substantiality of the evidence, the court must consider all of the evidence in the record, "tak[ing] into account whatever in the record fairly detracts from its weight." Universal Camera Corp., 340 U.S. at 488. Reviewing the evidence in the record before it here, the court "cannot conscientiously find that the evidence supporting [the BCNR's] decision is substantial, when viewed in the light that the record in its entirety furnishes

---

[23] The court ascertained the meaning of the code located in box twenty, "Physical Readiness," from Naval Operations Instruction 6110.1G (Oct. 10, 2002).

. . . ." See id.  Without the guidance of a well-supported decision from the BCNR, and in light of the wholly discretionary nature of the Navy's decision whether to defer plaintiff's mandatory separation, the court cannot determine what record evidence should truly be afforded the most weight in ascertaining whether an injustice has occurred.  The court therefore sets aside the BCNR's April 2, 2001 decision and denies defendant's motions for judgment on the administrative record.  In addition, for the same reasons, the court cannot award the relief requested by plaintiff in his first amended complaint. See also Istivan v. United States, 689 F.2d 1034, 1039 (Ct. Cl. 1982) (finding a lack of substantial evidence in support of a correction board decision but declining to hold that plaintiff was "entitled to judgment as a matter of law" based on the record before it).

Instead, the court is compelled to exercise the authority granted by 28 U.S.C. § 1491(a)(2) to remand the case to the BCNR for reconsideration of plaintiff's application.  In remanding the case to the BCNR, the court is following established binding precedent.  For example, as noted above, in Istivan, the Court of Claims held that the correction board's decision was not supported by substantial evidence, but declined to render judgment in plaintiff's favor.  689 F.2d at 1039.  Thus, it remanded the case to the correction board to render a new decision.  Id.  Further, in Sanders v. United States, the Court of Claims, presented with a correction board decision that did not contain a rationale for the board's failure to void the service member's passovers for promotion, "remanded the case to the Correction Board, instructing it 'to make findings of fact showing the basis for its conclusions.'"  594 F.2d 804, 808-09 (Ct. Cl. 1979) (en banc) (quoting its remand order, Sanders v. United States, 207 Ct. Cl. 962 (1975)), superseded in part by statute, 10 U.S.C. § 628 (2000 & Supp. I 2002), as recognized in Richey, 322 F.3d at 1323-24.  Remand is similarly appropriate in the instant case.

## IV.  CONCLUSION

For the reasons set forth above, the court **DENIES** Defendant's Motion to Dismiss, or, in the Alternative, for Judgment Upon the Administrative Record and Defendant's Renewed Motion for Judgment Upon the Administrative Record in their entirety and sets aside the BCNR's April 2, 2001 decision.  The court **REMANDS** the case to the BCNR for prompt reconsideration of plaintiff's application, with the following instructions:

- The remand period shall terminate on **Tuesday, December 29, 2009**.  The court **STAYS** proceedings in the instant case during that time.  If the BCNR has not issued a decision by December 28, 2009, the parties shall follow the procedures set forth in RCFC 52.2(d).

- The BCNR's inquiry shall be limited to determining whether the Navy's failure to defer plaintiff's mandatory separation beyond March 15, 1999, constituted an injustice.

- The BCNR's written decision shall comply with the applicable regulations. <u>See</u> 32 C.F.R. §§ 723.3(e)(3)-(4) (denying applications without hearing), .6(a)(3) (granting applications and denying applications after hearing).

- Pursuant to RCFC 52.2(b)(1)(D), defendant shall file a status report **no later than Tuesday, September 29, 2009**, indicating the status of the proceedings before the BCNR.

- When proceedings before the BCNR have concluded, the BCNR shall forward four copies of its decision to the clerk of the Court of Federal Claims pursuant to RCFC 52.2(e).  The parties shall then file, **within thirty days** of the filing of the BCNR's decision, the notices required by RCFC 52.2(f)(1).

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge
