# In the United States Court of Federal Claims

No. 05-214 C
(Filed: October 27, 2011)

*************************************

| | |
|---|---|
| MICHAEL R. PEOPLES, * | |
| * | |
| Plaintiff, * | RCFC 52.1; Correction of Military Records; |
| * | Decision After Remand to Board; |
| v. * | Mandatory Separation; Medical Evaluation |
| * | Board; Physical Evaluation Board; |
| THE UNITED STATES, * | Substantial Evidence; Injustice |
| * | |
| Defendant. * | |

*************************************

James R. Klimaski and Lynn I. Miller, Washington, DC, for plaintiff.

Armando A. Rodriguez-Feo, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff, a retired lieutenant commander with the United States Naval Reserve ("Naval Reserve"), alleges that the United States Navy ("Navy") was required to postpone his mandatory separation for medical reasons, and that the decision of the Board for Correction of Naval Records ("BCNR") to the contrary was arbitrary, capricious, contrary to law, and unsupported by substantial evidence. In a prior ruling, the court concluded that plaintiff's separation was legally proper, but remanded the case to the BCNR for a determination of whether plaintiff's separation was unjust. After the BCNR issued two decisions addressing the justness of plaintiff's separation, the parties cross-moved for judgment on the administrative record. For the reasons set forth below, the court enters judgment for defendant.

# I. BACKGROUND

## A. Factual History

Plaintiff enlisted in the Naval Reserve on February 2, 1987, with the intent of obtaining a commission as a reserve officer in the Navy.[1]  AR Vol. II at 63, 67, 69-74.  On September 25, 1987, upon his completion of Officer Candidate School, plaintiff was commissioned as an ensign in the Naval Reserve and began active duty in the Navy's Surface Warfare Division.  Id. at 4, 59, 63, 67, 72-73, 80; Am. Compl. ¶ 6.  He was subsequently promoted to the rank of lieutenant (junior grade) on September 25, 1989, AR Vol. II at 60, 80, and the rank of lieutenant on October 1, 1991, id. at 61-62.  On April 4, 1995, plaintiff accepted a commission in the Regular Navy, where he served on active duty until his discharge.  Id. at 61, 67, 80.  During his active duty naval service, plaintiff served aboard the USS Gray (FF 1054), the USS George Washington (CVN 73), and the USS Paul Hamilton (DDG 60), and received exemplary evaluations from his commanding officers.  Id. at 6-12, 15-28, 31-32, 35-46.  Indeed, in all of his evaluations, he was only twice marked as not meeting a particular standard.  Id. at 37 (reflecting that he was "progressing" in the category of "military bearing/character"), 39 (same).  However, for both Fiscal Year 1998 and Fiscal Year 1999, plaintiff was not selected for promotion by the Selection Board.  Id. at 80.  As a result, pursuant to the applicable law, plaintiff was slated for separation from the Navy.  See id. at 65; Am. Compl. ¶ 11.  At the end of August 1998, in preparation for his separation, he was assigned temporary duty with the Commander of Destroyer Squadron Thirty-One in Pearl Harbor, Hawaii.  AR Vol. II at 45-46 (indicating a transfer date of August 28, 1998), 110 (indicating a transfer date of August 31, 1998).  The Navy issued, and plaintiff received, plaintiff's mandatory separation orders on October 15, 1998, indicating that plaintiff was to be separated by no later than March 1, 1999.  AR Vol. I at 265, 287-89, 292; accord AR Vol. II at 80.  But see Am. Compl. ¶ 11 (indicating that plaintiff received his mandatory separation orders on October 22, 1998).

Before joining the Naval Reserve in 1987, plaintiff underwent a physical examination at the Military Entrance Processing Station in Richmond, Virginia.  AR Vol. II at 89-92.  At the time, plaintiff weighed 228 pounds and stood 72.5 inches tall.  Id. at 90.  Plaintiff reported, among other things, that he had a history of "recurrent back pain," that he sustained a back injury playing lacrosse in high school that had no sequela, and that he suffered from Osgood-Schlatter

---

[1]  Although the court included a comprehensive statement of facts in its prior ruling, it presents the facts again, with some modifications, to provide a backdrop for the current motions.  The court derives the facts from plaintiff's First Amended Complaint ("Am. Compl.") and both volumes of the administrative record ("AR Vol. I" and "AR Vol. II," respectively).  Some pages in the administrative record are printed double-sided, but lack page numbers on the reverse side.  For ease of reference, the court appends a "b" to the page number when citing the reverse side of a page.

disease from the ages of thirteen to fifteen.[2]  Id. at 91-92.  Plaintiff subsequently received regular medical care throughout his naval service.  See generally AR Vol. I at 16-235 (containing medical records from plaintiff's time in Officer Candidate School, on active duty, and postseparation).  Among the problems that appear in the more than twelve years of records are knee pain, back pain, and a lack of sensation in his legs.[3]  See generally id.  On various occasions during this time period, plaintiff's physicians recommended restrictions on plaintiff's physical activity.  See, e.g., id. at 159b (May 15, 1995 restrictions due to back pain), 173b (April 1991 restrictions due to back pain), 190-91b (September 1989 restrictions due to knee pain, including restrictions on weightlifting), 192 (December 9, 1988 restrictions due to knee pain).  He also underwent physical therapy.  See, e.g., id. at 52 (March 9, 1999), 129 (February 23, 1999), 143 (December 15, 1998), 164 (August 13, 1993), 168 (July 6, 1993), 188 (September 12, 1989).

On September 14, 1997, plaintiff underwent his last periodic physical examination prior to his separation physical examination.  Id. at 199-200b.  But see id. at 243 (indicating, in a February 12, 1999 nonmedical assessment, that plaintiff's most recent physical fitness test/physical readiness test was in March 1998).  At the time, he weighed 249 pounds.  Id. at 199.  He reported, among other things, a history of knee pain and intermittent back pain.  Id. at 200b.  However, the physician assistant's clinical assessment of plaintiff was normal, and plaintiff was deemed to be "qualified."  Id. at 199-199b; cf. AR Vol. II at 44 (containing a July 1998 Fitness Report and Counseling Record prepared by plaintiff's commanding officer indicating that plaintiff "[s]cored an 'outstanding' on [his] most recent [physical readiness test]").

On October 22, 1998, shortly after plaintiff received his mandatory separation orders, he was seen at the Navy's Pearl Harbor Adult Clinic with, among other complaints, "lots of stress" over the last two months, back pain, and knee pain.  AR Vol. I at 151; accord id. at 265.  Because the Navy lacked an orthopedist on the island of Oahu, plaintiff was referred to Tripler Army Medical Center ("TAMC") in Honolulu for his knee and back pain.  Id. at 265.  He was ultimately able to obtain an appointment for November 20, 1998, at which time he also visited the Pain Clinic and had an x-ray of his lumbar spine.  Id. at 116, 141, 145-49, 265.  The orthopedist also ordered magnetic resonance images ("MRIs") of plaintiff's lumbar spine and right knee.  Id. at 145.  In addition to his treatment at TAMC, throughout November and into December plaintiff saw a number of medical personnel for his complaints, including physicians and physical therapists, at the Pearl Harbor Medical Clinic.  See, e.g., id. at 143-44, 150, 156-58.

_____

[2]  Osgood-Schlatter disease is a painful swelling of the leg below the knee that may occur in adolescents who play sports, and generally goes away on its own or when the adolescent stops growing.  See Nat'l Ctr. for Biotech. Info., Nat'l Insts. of Health, Osgood-Schlatter Disease, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002238/ (last reviewed Nov. 12, 2010).

[3]  These medical records first reference knee pain in December 1988, AR Vol. I at 192, 194, back pain in April 1991, id. at 173, and radiating leg pain in November 1998, id. at 141, 145.

During this same time period, plaintiff decided to accept an inactive duty appointment in the Naval Reserve, which would apparently begin upon his separation from the Navy.  AR Vol. II at 62; see also AR Vol. I at 272 (averring that plaintiff was "required to sign up with the reserves (in order to receive a severance)").  Plaintiff initially executed the Oath of Office on December 10, 1998, but it was not signed by the witnessing officer until March 2, 1999.  AR Vol. II at 62.

Plaintiff underwent his separation physical examination on December 16, 1998, at the Pearl Harbor Medical Clinic.[4]  Id. at 97-98, 102-03; AR Vol. I at 230-33, 239-42.  At the time of his examination, he weighed 265 pounds.  AR Vol. II at 103.  On his Report of Medical History, plaintiff highlighted a number of issues in his medical history, including his knee and back problems.  Id. at 98; AR Vol. I at 232, 241; see also id. at 240 (containing the physician assistant's notes about plaintiff's medical history on a Report of Medical Assessment form).  He also reported all of his recent consultations and the fact that he had consultations with an orthopedist prior to 1998.  AR Vol. I at 241.  The physician assistant reviewed and commented on plaintiff's reported medical history.  Id.; AR Vol. II at 98.  He then noted, in his Report of Medical Examination, that plaintiff had a history of, among other things: (1) decreased sensation radiating down the left leg; (2) chronic back pain; and (3) chronic knee pain.  AR Vol. II at 102.  The physician assistant recommended that plaintiff follow up with physicians at the Pearl Harbor Medical Clinic, TAMC, and the Department of Veterans Affairs ("VA") for all of his health issues.  Id. at 103; AR Vol. I at 240.  He then checked the box next to "is qualified for," next to which is a handwritten notation "separation board," with "separation" crossed out and "board" underlined.[5]  AR Vol. II at 103; see also AR Vol. I at 309 (averring that at his separation physical

---

[4]  The complete records for this examination are not found in any one place in the administrative record.  It appears that the following forms constitute the complete record for plaintiff: (1) a two-page Report of Medical History (Standard Form 93) that, due to the number of comments by the examiner, was continued on a duplicate second page, making a total of three pages; (2) a two-page Report of Medical Assessment (DD Form 2697); and (3) a two-page Report of Medical Examination (Standard Form 88).  Volume II of the administrative record, which contains plaintiff's service record, includes the first and third pages of the Report of Medical History, AR Vol. II at 97-98, and the Report of Medical Examination, id. at 102-03.  Volume I of the administrative record includes the proceedings before the BCNR.  Thus, this volume includes the medical records submitted by plaintiff to the BCNR, among which are the first page of the Report of Medical History, AR Vol. I at 232-33, the first page of the Report of Medical Assessment, id. at 231, and the first page of the Report of Medical Examination, id. at 230.  This volume also includes the Medical Evaluation Board ("MEB") package that plaintiff provided to the BCNR, which contains the first two pages of the Report of Medical History, id. at 241-42, the second page of the Report of Medical Assessment, id. at 240, and the first page of the Report of Medical Examination, id. at 239.

[5]  Because there is a note dated February 10, 1999, alongside this language, it is unclear when the words "separation" and "board" were written, struck through, and underlined.  See AR

examination, he was declared "Fit for MEDBOARD," not "Fit for Separation"); cf. AR Vol. II at 103 (containing a stamp stating: "Separation examination completed[.]  All appropriate treatment not completed within 180 days of separation.").

Three days later, on December 19, 1998, plaintiff had his scheduled MRIs taken at TAMC.  AR Vol. I at 111-12, 114-15.  The knee MRI revealed, among other things, "severe chondromalacia patella, Grade IV, with subchondral degenerative geodes in the lateral facet with diffuse cartilage narrowing."  Id. at 112.  The spine MRI revealed, among other things, "[m]ild rotary spondylolisthesis of L5 in relationship to S1 with bilateral pars defects and moderate canal stenosis."  Id. at 115.

Plaintiff returned to the Orthopedic Clinic at TAMC on January 15, 1999, where he was provided the findings of the MRIs.  Id. at 140; Am. Compl. ¶ 12.  The orthopedist recommended arthroscopic surgery of plaintiff's right knee and a "possible" L5-S1 fusion procedure.  AR Vol. I at 140.  According to plaintiff, he was told that he needed to undergo both surgical procedures "as soon as possible," that "he was no longer fit for sea duty," that "he should avoid ladders and stairs," and that he should not "lift anything over ten pounds."[6]  Am. Compl. ¶ 13; accord AR Vol. I at 266.  In a January 19, 1999 notation on the January 15, 1999 record from the Orthopedic Clinic, plaintiff's orthopedist further suggested, with respect to plaintiff's spinal issues: "Stabilization training x 3 months.  If no improvement, then spinal fusion, requiring 6 month[s] to [a] year for full recovery.  Potential for return to full duty good.[7]  No sea duty.  Recommend [Physical Evaluation Board ("PEB")]."  AR Vol. I at 140 (footnote added).

After his appointment with the orthopedist at TAMC, plaintiff proceeded to the Patient Administration office at the Navy's Pearl Harbor Medical Clinic, where he conferred with both the PEB representative and the Leading Chief Petty Officer.  Id. at 266; Am. Compl. ¶ 14.  They informed him that "although he was no longer fit for sea duty, the Navy would not place him on limited duty because he had received his mandatory separation orders."  Am. Compl. ¶ 14; accord AR Vol. I at 266.  They also informed him that only the Bureau of Naval Personnel could

---

Vol. II at 103 ("2/10/99 - has a Med Eval Board letter - by TAMC ortho - recommend retention & have procedures to lt. knee arthroscopy & spinal fusion performed").

[6] Plaintiff indicates that he received this advice from his "treating physicians" at the Pearl Harbor Medical Clinic.  Am. Compl. ¶ 13.  However, there are no medical records in the administrative record from that venue dated January 15, 1999.

[7] In its prior ruling in this case, the court found the word "good" in this record to be illegible.  As the BCNR noted in its first decision on remand, the "g" in "good" and the "y" in "duty" were written in such a way that caused the "g" and the "oo" in "good" to appear as "99."  Moreover, the "d" in "good" is cut off in the court's copy of this record, which made it appear to be nothing more than a stray mark.  Reviewing the record again, the court concurs with the BCNR that the word the court initially found to be illegible is, in fact, the word "good."

hold him beyond his mandatory separation date.  AR Vol. I at 266.  To obtain such a postponement, they explained, his orthopedist at TAMC would need to convene an MEB and forward the MEB report and supporting materials to the PEB.  Id.  Plaintiff was told that so long as the PEB received the MEB package by midnight on March 1, 1999, his "separation would be held in abeyance pending PEB action."  Id.; accord Am. Compl. ¶ 16.

Plaintiff was officially referred to the PEB on January 20, 1999.  AR Vol. I at 292; see also id. at 139 (containing an internist's January 29, 1999 clinical notes that include the following notation: "PEB for Ortho in process").  On January 27, 1999, personnel from the Pearl Harbor Medical Clinic requested that the Navy hold plaintiff's mandatory separation orders in abeyance pending the PEB.  Id. at 292.  But see id. at 266-67 (indicating that there was a similar request on January 17, 1999).  Subsequently, on January 31, 1999, plaintiff was transferred to temporary duty at the Transient Personnel Unit at Naval Station Pearl Harbor so that he could undergo the PEB.  AR Vol. II at 45, 110; cf. id. at 45 (containing a Fitness Report and Counseling Record for the period spanning July 8, 1998, to January 31, 1999, reflecting plaintiff's medical waiver for the physical readiness test).  But see AR Vol. I at 268 (contending that plaintiff was not transferred until February 27, 1999, backdated to January 29, 1999, because his command believed that he would be placed in a medical hold status).

As noted by his internist on February 5, 1999, however, plaintiff was having difficulty with the PEB process:

> Is getting a run around from Ortho attempting to get PEB done.  He was 1st told PEB would be done at [TAMC] by his Ortho, Dr. [Jeffrey J.] Meter.  Then told not to have PEB until [after] arthroscopy.  But he now was told he would see a PEB person at [TAMC] on the 9th, but told to see one at [Pearl Harbor Medical Clinic] on the 8th.  He is very upset.

AR Vol. I at 134; see also id. at 267 (explaining plaintiff's "thrice weekly visits to Patient Admin[istration]" and "daily shuttle trips between" Patient Administration and TAMC to facilitate the convening of an MEB, as well as the procedural difficulty in having the Army prepare an MEB report for him, a Navy officer).  He ultimately had his MEB appointment at TAMC on February 9, 1999.  Id. at 131; see also Am. Compl. ¶ 15 (indicating that an MEB had been convened).  In his February 10, 1999 report, Dr. Richard C. Rooney, an orthopedist,[8] assessed:

> Left L4-5 herniated nucleus pulposus as well as mild L5-S1 spondylolisthesis and severe degenerative changes to [plaintiff's] patellofemoral cartilage in his right knee as well as a lateral meniscal tear.  His back and knee problems are most likely the result of progressive degeneration as a result of the physical

---

[8]  Plaintiff's regular orthopedist, Dr. Meter, was unavailable to prepare the MEB report. AR Vol. I at 267.

requirements of his rank in the U.S. Navy.  Current prognosis with nonoperative
therapy is that his back and knee pain will progressively worsen with increasing
debility.  However, the prognosis after operative stabilization and potential
decompression of his spine as well as debridement of his lateral meniscal tear is
excellent with a very high likelihood of full recovery and the ability to resume full
active duty status in the United States Navy.  It is likely that his impairment due to
his back and knee conditions were related, and that his inability to maintain erect
posture, inability to negotiate stairs and ladders, inability to stand for prolonged
periods of time were related.

AR Vol. I at 237-38.  Dr. Rooney concluded: "The recommendation is that [plaintiff] maintain
himself on active duty status and undergo right knee arthroscopy and, after three months
stabilization training of his lumbar spine, undergo probable spinal fusion at L5-S1.  This case is
being referred to the Central Physical Evaluation Board for adjudication."[9]  Id. at 237; accord AR
Vol. II at 103 (containing the record from plaintiff's separation physical examination, which
includes the following note: "2/10/99 - has a Med Eval Board letter - by TAMC ortho -
recommend retention & have procedures to lt. knee arthroscopy & spinal fusion performed").

       Plaintiff hand delivered Dr. Rooney's report to Patient Administration and was advised
that he could provide a written response to the report.  AR Vol. I at 267; see also id. at 250
(reflecting plaintiff's intent to provide such a response).  He prepared his response on February
11, 1999, providing additional information and supporting Dr. Rooney's ultimate
recommendation.  Id. at 247-49.  He hand delivered his response to Patient Administration that
same day.  Id. at 267.  After some delay due to the Navy's continued uncertainty that it could use
an MEB report from the Army,[10] id., Dr. Rooney reviewed plaintiff's response on February 23,
1999, indicating that no changes to his MEB report were necessary, id. at 246.  To complete the
MEB package, the Commander of Destroyer Squadron Thirty-One prepared a nonmedical

-------

       [9]  The final sentence–"This case is being referred to the Central Physical Evaluation
Board for adjudication."–appears in a typeface different from the one used for most of the rest of
the report, AR Vol. I at 237, which suggests that it was added after the report was transcribed.
However, the administrative record does not indicate when the sentence was added or for what
purpose.  It may have been added once Dr. Rooney reviewed the transcription of his dictated
report and realized it was missing.  Or, it may have been added at plaintiff's request after he
reviewed the report but before he provided it to Patient Administration.  Ultimately, the court is
unable to conclude why and when the sentence was added.  Fortunately, the outcome in this case
is not dependent on the resolution of this issue.

       [10]  It is apparent, however, that plaintiff remained confident that the PEB would receive
the MEB package prior to March 1, 1999, thus postponing his separation date, because during a
follow-up appointment with a physical therapist at the Pearl Harbor Medical Clinic on February
23, 1999, he indicated that he was scheduled to have arthroscopic surgery on his right knee on
March 11, 1999, and spinal fusion one month afterwards.  AR Vol. I at 129.

assessment of plaintiff on February 12, 1999.  Id. at 243-44.  In his assessment, the Commander indicated, among other things, that plaintiff's condition required him to be away from his duties for an average of eight hours per week and that he was not then "worldwide assignable."  Id. at 243-44.  He then recommended that plaintiff be permitted "another period of Temporary Limited Duty" and "to remain on active duty in a Permanent Limited Duty Status if found Unfit."  Id. at 244.

Although plaintiff had been informed that the MEB package would be ready for mailing on February 19, 1999, id. at 267, the commanding officer of the Pearl Harbor Medical Clinic did not approve the package until February 25, 1999, id. at 236, 268, 292.  Given his looming mandatory separation, plaintiff consulted with Patient Administration, who confirmed with the Bureau of Naval Personnel that an MEB package transmitted to the PEB via facsimile would be sufficient to delay his discharge, so long as the original version was in the mail.  Id. at 268.  The next day, however, Patient Administration told plaintiff that the Bureau of Naval Personnel had reversed itself and advised that a facsimile transmission would not be acceptable.  Id.  Plaintiff volunteered to pay for overnight mailing, but was informed that he was not permitted to do so. Id.  The Chief Staff Officer of Destroyer Squadron Thirty-One interceded on plaintiff's behalf, and was informed that the MEB package "would be mailed in sufficient time to reach [the] PEB by the midnight March 1st deadline."  Id.

The next day, February 26, 1999, plaintiff was informed that his MEB package had not been mailed.  Id.  The Chief Staff Officer was then told that the MEB package "had been mailed via overnight mail and would arrive at the PEB no later than Sunday, February 28th."  Id.  Based on this information, the Chief Staff Officer allowed plaintiff to travel to a conference at Andrews Air Force Base near Washington, DC to make a presentation.  Id.; see also id. (indicating that plaintiff had volunteered to hand deliver his MEB package to the PEB, which was located in Washington, DC, but was informed that he could not do so).  Accordingly, plaintiff left for Washington, DC on February 28, 1999.  Id. at 269.  However, upon his arrival on March 1, 1999, he was instructed to immediately return to Hawaii because his MEB package had not been mailed and thus he would be separated at midnight that day.  Id.

Through no fault of plaintiff, indeed, despite plaintiff's best efforts, the PEB did not receive his mailed MEB package until March 2, 1999.  Id.; Am. Compl. ¶ 17.  Although the MEB package had been transmitted to the PEB via facsimile prior to March 1, 1999, AR Vol. I at 292, and without confirming whether plaintiff had been separated, id. at 269, the Navy instructed the PEB to not review it, Am. Compl. ¶ 17.

As it turned out, notwithstanding his mandatory separation orders, plaintiff was not discharged on March 1, 1999.  See id. ¶ 18 (indicating that the Navy postponed plaintiff's discharge); AR Vol. I at 292 (citing section 3830240(1)(b) of the Naval Military Personnel Manual ("MILPERSMAN") for the proposition that "officers in receipt of separation orders who are pending a physical evaluation board will not be separated without specific direction" from the Chief of Naval Personnel).  Rather, on March 4, 1999, the Personnel Support Detachment at

Pearl Harbor, citing MILPERSMAN § 3830240(1)(b) and noting both the timely facsimile transmission and untimely mailing of the MEB package, sought the "appropriate disposition" for plaintiff from the Bureau of Naval Personnel. AR Vol. I at 292. It emphasized that plaintiff was "not physically qualified for separation" and that his attending physician recommended plaintiff "undergo major surgery (spine) and aftercare/recovery over the next 06 months." Id. The Commander of Naval Personnel Command responded the following day. Id. at 293. He first noted that paragraph 4B of Navy Administrative Message 064/95 provided that "[members] pending a mandatory separation or retirement will not be delayed unless [the member] is either hospitalized or a medical board report has been accepted by the PEB for disability evaluation processing prior to the mandatory release/retirement date." Id. The Commander then indicated that he had confirmed with the PEB that the "PEB did not accept" plaintiff's MEB package. Id. Accordingly, he directed the Personnel Support Detachment to discharge plaintiff effective March 1, 1999, at 11:59 p.m. and indicated that plaintiff's relief resided with the BCNR. Id.; accord id. at 269.

Despite the Commander's instruction, the Navy did not discharge plaintiff. In an effort to clarify his status and seek a deferment of his discharge date, plaintiff and his family corresponded and consulted with a number of government officials. Id. at 269; see also id. at 275-85 (containing some of the correspondence). Plaintiff underwent the scheduled arthroscopic surgery at TAMC on March 11, 1999, id. at 41-43, 51, 270; Am. Compl. ¶ 20, obtaining a postoperative diagnosis of "[r]ight knee patellofemoral chondromalacia, grade III," AR Vol. I at 41. The next day, the Personnel Support Detachment at Pearl Harbor informed the Commander of Naval Personnel Command that it was separating plaintiff effective March 15, 1999. Id. at 291; accord id. at 270; Am. Compl. ¶ 18. Despite this two-week postponement of plaintiff's separation from the Navy, the appropriate officials did not resubmit his MEB package to the PEB and the PEB did not consider plaintiff's MEB package during that time. Am. Compl. ¶ 18; AR Vol. I at 270. Thus, on March 15, 1999, plaintiff was honorably discharged from active duty, Am. Compl. ¶¶ 18, 21; AR Vol. II at 65, 67, 110, 270, remaining on inactive duty in the Naval Reserve,[11] AR Vol. II at 67. Subsequently, after a spinal discogram revealed three herniated discs, AR Vol. I. at 34-35, 270, he underwent the recommended spinal fusion procedure on April 12, 1999, at TAMC, id. at 34-35; Am. Compl. ¶ 22.

After his spinal surgery, plaintiff was unable to work or otherwise perform his duty in the Naval Reserve. AR Vol. I at 270, 272-73. His follow-up examinations at TAMC revealed that although he had initially done well after his back surgery, he began experiencing back and leg pain. See, e.g., id. at 252 (noting, on June 15, 1999, that plaintiff was "doing well up until 2 wks ago - had [increased lower pack pain]" and complained of "some [right] leg pain & [decreased]

---

[11] Plaintiff was promoted to the rank of lieutenant commander with the Naval Reserve on October 1, 1999. AR Vol. II at 80. But see id. at 111 (indicating that plaintiff accepted an appointment as a lieutenant commander on January 26, 2000, with "a date of rank of October 1, 2000"). On June 28, 2002, he was honorably discharged from the Naval Reserve. Id. at 68, 80.

sensation [in right] L5"), 253 (noting, on July 12, 1999, that plaintiff had pain in his back and numbness in his legs), 254 (noting, on August 23, 1999, that plaintiff continued to have back and left leg pain), 255 (noting, on September 13, 1999, that a CT scan of plaintiff's spine had revealed "significant osteolysis & sclerosis about bone dowels").  He applied, unsuccessfully, for unemployment, Social Security Disability, and welfare benefits, and eventually exhausted his savings.  Id. at 270-73.  He finally received assistance from the VA, which, after determining that plaintiff's knee and back injuries were service-connected on September 16, 1999, id. at 294-300, and that his combined disability rating was eighty percent, id. at 297, awarded him "individual unemployability benefits" on September 28, 1999, id. at 301-02.  See also id. at 272 (providing plaintiff's explanation of the VA's findings).  The VA subsequently approved plaintiff for Vocational Rehabilitation benefits on January 19, 2000.  Id. at 274.

### B.  Procedural History

Plaintiff, acting pro se, sought relief from the BCNR on July 28, 2000.  Id. at 12. Specifically, in a letter attached to his Application for Correction of Military Record, plaintiff requested the following: (1) "expeditious consideration" of his application; (2) placement on active duty effective March 16, 1999; (3) back pay from March 16, 1999, to September 30, 1999, at the lieutenant rate; (4) back pay from September 30, 1999, to either (a) the last date of his rehabilitation or (b) the present, whichever is earlier, at the lieutenant commander rate; (5) the forwarding of a "new, 'correct'" MEB package to the PEB for "due consideration and action"; (6) "if required, [Permanent Change of Station] orders to an appropriate area for follow-up care/rehabilitation"; (7) if found unfit for duty by the PEB, the resetting of all discharge proceedings to conform with the new discharge/retirement date; (8) any discharge following action by the PEB be as a lieutenant commander; and (9) an "accommodation . . . between the Navy, the VA, and Social Security in order to 'limit [his] liability' with respect[] to paying back any monies received."  Id. at 14-15.  Based on plaintiff's requested relief, it is apparent that he was not seeking a particular determination of fitness or unfitness from the PEB or the BCNR, but rather a rectification of the Navy's failure to timely forward his MEB package to the PEB, such that he would be restored to active duty status while the PEB considered whether he was fit for duty.

On August 16, 2000, the BCNR requested from the relevant authorities copies of any PEB proceedings, the VA's Rating Decisions, and plaintiff's medical records.  Id. at 10-11.  The BCNR then forwarded the records it received, along with plaintiff's service record, to the Director of the Naval Council of Personnel Boards on October 2, 2000, with the following queries:

In your opinion, was [plaintiff] unfit for duty on 1 March 1999?[12]  Should he have been retained on active duty until such time as disability evaluation could be

_____

[12]  As previously noted, plaintiff did not request a finding that he was unfit for duty in his application to the BCNR.  Rather, he requested that the PEB duly consider his MEB package.

completed?  He is not physically qualified for (NPQ) for service in the Naval
Reserve.  In the event he elects a hearing before the PEB, will the PEB make a
determination of his fitness for duty, as in cases where the provisions of paragraph
1003d, [Secretary of the Navy Instruction ("SECNAVINST")] 1850.4D apply, or
will the finding be limited to PQ or not NPQ?

Id. at 9 (footnote added).  The Director responded to these queries in an October 24, 2000 letter,
finding first that "the evidence in this case does not support a finding that [plaintiff] was unfit for
duty on 1 March 1999."  Id. at 6; accord id. at 7 (finding that plaintiff was "technically Fit
(except for shipboard deployability)" for PEB purposes).  In support of this finding, the Director
noted that (1) based on the lack of "an Officer's Fitness Report for [plaintiff]'s last eight to nine
months on active duty," he presumed that plaintiff "was able to perform duties appropriate to his
rank and designator during [that] time"; (2) plaintiff had to "attest to his fitness and submit any
evidence to the contrary" when he accepted his reserve commission; (3) although it was "clear
that corrective surgery had been recommended," there was no indication of "clinical urgency" in
plaintiff's medical records at the time of his separation; and (4) plaintiff sought civilian
employment prior to his discharge.  Id. at 6.  The Director also noted that (1) plaintiff's
"persistent history of low back pain" had been resistant to treatment for the six years prior to his
mandatory separation; (2) had plaintiff been retained on active duty, he would not have been
found to be unfit until the failure of his spinal surgery had been ascertained; (3) plaintiff's "major
medical difficulties appear to have occurred" after his spinal surgery, and not at the time of his
mandatory separation; and (4) had plaintiff "been retained on active duty, he would have been
placed in a Limited Duty status in conjunction with his 12 April 1999 surgery and likely not have
been found Unfit by the PEB for his spinal condition until the failure of said surgery had become
apparent much later."  Id. at 6-7.  The Director finally found that if plaintiff requested a PEB as a
reservist, the PEB's inquiry would be limited to whether plaintiff was physically qualified or not
physically qualified, and would not touch upon his fitness for duty.  Id. at 7.

The BCNR forwarded the Director's advisory opinion to plaintiff on October 25, 2000,
for his review and comment.  Id. at 8.  Plaintiff responded in a January 23, 2001 letter,
highlighting the following evidence supporting his lack of fitness at the time of his separation:
(1) the chronic nature of his knee and back injuries, dating back to 1989 and 1991, respectively,
as demonstrated in his medical records; (2) the limitations placed upon his activities by his
physicians because of these injuries, as reflected in his medical records; and (3) his inability to
fully perform the duties of his office (Combat Systems Officer/Physical Security Officer aboard
the USS Paul Hamilton), grade (lieutenant), or rating (Surface Warfare Officer).  Id. at 4.  He
also contended that "reasonable doubt" existed as to whether he was fit for duty at the time of his
separation, pointing to the recommendation of the MEB, the contents of his response to the MEB
report, and the recommendations contained within the nonmedical assessment that accompanied
the MEB report.  Id. at 5.  Plaintiff next explained that although he sought civilian employment
prior to his separation, he informed all of his prospective employers that his discharge date from
the Navy was uncertain because he "was being held on active duty in order to correct some
medical problems."  Id.  He also explained that he had signed his Naval Reserve Oath of Office

in December 1998, prior to learning of the MRI results that would conclusively preclude him from serving in the active reserves.  Id.  Plaintiff concluded his letter by citing several provisions of SECNAVINST 1850.4D that demonstrated the errors that had occurred in the processing of his MEB report and the failure to convene a PEB.  Id.

The BCNR considered plaintiff's application on March 8, 2001, voting to deny relief.  Id. at 1, 3.  It informed plaintiff of its decision in an April 2, 2001 letter, explaining:

> After careful and conscientious consideration of the entire record, the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice.  In this connection, the Board substantially concurred with the comments contained in the advisory opinion.  It noted that your separation was in accordance with 10 U.S. Code 631, based on your failure of selection for promotion.[13]  Although the Secretary of the Navy could have deferred your separation under the terms of 10 U.S. Code 640, had he decided that additional time was needed for the evaluation of your physical disability, you did not have the right to be retained on active duty.  The Board was not persuaded that there was inordinate delay in the processing of your case by naval medical authorities, or that the failure of the Secretary to defer your mandatory separation was erroneous or unjust.  Accordingly, your application has been denied.

Id. at 1 (footnote added).  The BCNR did not make an express finding of whether plaintiff was fit for duty at the time of his separation.

Plaintiff, represented by counsel, filed a complaint in this court on February 11, 2005, and an amended complaint on September 2, 2005.  He stated two claims for relief.  First, plaintiff contended that the BCNR's failure to correct "his military records to reflect that he was unfit for duty at the date of discharge and thus entitled to PEB review prior to discharge . . . was arbitrary, capricious, unsupported by substantial evidence or contrary to applicable law or regulation."  Am. Compl. ¶ 27.  Second, plaintiff asserted that the BCNR's failure to correct his military records precluded him "from receiving military pay, allowances, disability retirement, and other benefits."  Id. ¶ 29.  Accordingly, plaintiff requested the following relief: (1) "[r]einstatement to active duty as of March 15, 1999, the date of discharge"; (2) "[b]ack pay, allowances and benefits from March 15, 1999"; (3) an order directing the Navy to convene a PEB on plaintiff's behalf; (4) attorney's fees and costs; and (5) "[a]ny further relief that this Court deems just and proper."  Id. § V.

Defendant moved to dismiss plaintiff's complaint for lack of jurisdiction, or, in the

---

[13]  Because the advisory opinion does not cite or otherwise refer to 10 U.S.C. § 631, the court presumes that the pronoun "it" that begins this sentence refers to the BCNR.

alternative, for judgment on the administrative record.[14]  In a June 29, 2009 Opinion and Order, the court denied defendant's motion in its entirety.  Peoples v. United States, 87 Fed. Cl. 553, 557 (2009).  As a threshold matter, based upon the relief plaintiff requested from the BCNR, the court construed plaintiff's complaint as setting forth an allegation "that the BCNR should have corrected his military records to reflect a return to active duty so that the PEB could make a fitness determination."  Id. at 567.  It therefore held that plaintiff's claim for back pay under 37 U.S.C. § 204(a)(1) was within its jurisdiction.  Id. at 568.

On the merits of plaintiff's claim, the court concluded that the MEB's referral of plaintiff's case to the PEB was proper and that the PEB should not have rejected plaintiff's MEB package as untimely.  Id. at 574.  It held, however, that "the Navy was entitled to separate plaintiff pursuant to 10 U.S.C. § 632" and therefore "[t]he BCNR's determination that plaintiff had no 'right to be retained on active duty' was . . . not arbitrary, capricious, or contrary to law."  Id. at 575.  Because there was no legal error, the only issue remaining was whether the Navy's failure to retain plaintiff on active duty constituted an injustice.  Id.  The court determined that the BCNR did not, in its decision, adequately "support its conclusion that the Navy's decision to discharge plaintiff on March 15, 1999, without a completed fitness evaluation by the PEB was just."  Id. at 577 (citing 32 C.F.R. § 723.3(e)(4) (2000)).  It was therefore compelled to "conduct its own inquiry to ascertain whether" the BCNR's conclusion found support in the administrative record.  Id. at 578.

Upon its examination, the court first concluded that the advisory opinion of the Director of the Naval Council of Personnel Boards was not supported by the evidence he cited and therefore any reliance on his decision by the BCNR to support a finding that plaintiff was fit for duty at the time of his separation was arbitrary and capricious.  Id. at 579.  It expressed particular concern with the Director's findings concerning plaintiff's acceptance of a commission in the Naval Reserve, plaintiff's pursuit of employment prior to his separation from the Navy, the presumption that plaintiff was able to perform his duties due to the lack of a fitness report for plaintiff's last eight or nine months on active duty, and the lack of evidence of clinical urgency in plaintiff's medical records.  Id. at 578-79.  It then found that evidence in the remainder of the administrative record both supported and weighed against the BCNR's conclusion.  Id. at 579.  The court ultimately concluded that "[w]ithout the guidance of a well-supported decision from the BCNR, and in light of the wholly discretionary nature of the Navy's decision whether to defer plaintiff's mandatory separation," it could not "determine what record evidence should truly be afforded the most weight in ascertaining whether an injustice has occurred."  Id.  Accordingly, it set aside the BCNR's decision and remanded the case to the BCNR for reconsideration of plaintiff's application.  Id.  The court limited the BCNR's inquiry to "determining whether the Navy's failure to defer plaintiff's mandatory separation beyond March 15, 1999, constituted an injustice."  Id. at 580.

---

[14]  The case was transferred to the undersigned on March 6, 2009, subsequent to oral argument on defendant's combined motion.

The BCNR issued a decision on remand on September 18, 2009 ("BCNR II"), and, on plaintiff's request for reconsideration, a second decision on May 28, 2010 ("BCNR III"). In both decisions, which are addressed more fully below, the BCNR declined to correct plaintiff's military record. Now before the court are the parties' cross-motions for judgment on the administrative record. The court heard argument on October 26, 2011, and is now prepared to rule.

## II.  CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

The parties have filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1, seeking to either overturn or uphold the BCNR's decisions on remand. In ruling on such motions, the court makes "factual findings . . . from the record evidence as if it were conducting a trial on the record." Bannum, Inc. v. United States, 404 F.3d 1346, 1357 (Fed. Cir. 2005);[15] see also id. at 1356 ("[J]udgment on the administrative record is properly understood as intending to provide for an expedited trial on the administrative record."). The court prefaces its discussion, as it did in its prior ruling, with a review of the statutes and regulations applicable to plaintiff's circumstances. That review is followed by a summary of the BCNR's decisions on remand and an analysis of whether the BCNR's decisions should be upheld.

### A.  Applicable Statutory and Regulatory Framework

### 1.  Promotion, Separation, and Retirement of Naval Officers

As previously noted, plaintiff was commissioned as an officer in the Naval Reserve on September 25, 1987, and, after four years of service, was promoted to the rank of lieutenant on October 1, 1991. See 10 U.S.C. § 619(a)(1) (1988) (containing the time-in-grade requirements for promotion to the ranks of lieutenant (junior grade) and lieutenant in the Navy). After the requisite time in grade, see id. § 619(a)(2), naval lieutenants may be recommended for promotion by a selection board convened for that purpose, see id. §§ 611(a), 619(b)(1). A naval lieutenant who has failed to be selected for promotion one time remains eligible for promotion. Id. § 619(b)(1). However, if a naval lieutenant is not selected for promotion a second time and is not recommended for promotion, the lieutenant loses his or her promotion eligibility. Id. § 619(b)(2). In such a case, the lieutenant must be separated from the Navy:

> [E]ach officer of the Regular Navy who holds the regular grade of lieutenant or lieutenant commander, who has failed of selection for promotion to the next higher regular grade for the second time and whose name is not on a list of officers recommended for promotion to the next higher regular grade shall–

---

[15]  The decision in Bannum was based upon RCFC 56.1, which was abrogated and replaced by RCFC 52.1. RCFC 52.1, however, was designed to incorporate the decision in Bannum. See RCFC 52.1, Rules Committee Note (June 20, 2006).

(1)  be discharged . . . not later than the first day of the seventh calendar month beginning after the month in which the President approves the report of the board which considered him for the second time;

(2)  if he is eligible for retirement under any provision of law, be retired under that law . . . not later than the first day of the seventh calendar month beginning after the month in which the President approves the report of the board which considered him for the second time; or

(3)  if on the date on which he is to be discharged under clause (1) he is within two years of qualifying for retirement . . . , be retained on active duty until he is qualified for retirement and then retired . . . , unless he is sooner retired or discharged under another provision of law.

10 U.S.C. § 632(a) (1994 & Supp. III 1998); accord SECNAVINST 1920.6A, enclosure (3), ¶ 3(a)(2) (Mar. 17, 1993).  "The retirement or discharge of an officer pursuant to" section 632 is "considered to be an involuntary retirement or discharge for purposes of any other provision of law." 10 U.S.C. § 632(b).

A naval officer may also be retired if the Navy determines that the officer "is unfit to perform the duties of the member's office, grade, rank, or rating because of a physical disability incurred while entitled to basic pay . . . ."  10 U.S.C. § 1201(a) (1994 & Supp. IV 1999). Moreover, the Secretary of the Navy:

may defer the retirement or separation under [title 10 of the United States Code] of any officer if the evaluation of the physical condition of the officer and determination of the officer's entitlement to retirement or separation for physical disability require hospitalization or medical observation that cannot be completed before the date on which the officer would otherwise be required to retire or be separated under [title 10].

Id. § 640.  Indeed, as noted above, "[o]fficers in receipt of separation orders who need hospitalization or treatment or in whose cases a report of a medical board, or a physical evaluation board is pending will not be separated nor transferred for separation without specific direction of [the Chief of Naval Personnel]."  MILPERSMAN § 3830240(1)(b).

## 2.  The Navy's Disability Evaluation System

When, prior to separation, a service member develops an illness or sustains an injury that might affect the member's ability to perform his or her duties, the member is referred into the

military's disability evaluation system.[16]  See generally Department of Defense Directive ("DoDD") 1332.18 (Nov. 4, 1996); Department of Defense Instruction ("DoDI") 1332.38 (Nov. 14, 1996); SECNAVINST 1850.4D (describing the Navy's implementation of the disability evaluation system).  A case should only be referred into the system when "optimal medical treatment benefits have been attained."  SECNAVINST 1850.4D, ¶ 1009.  Thus, "elective, surgical procedures that may affect a member's physical qualification for duty" should be completed prior to referral.  Id. ¶ 3206(a); accord Manual of the Medical Department ("MANMED"), art. 18-34(1) (Feb. 21, 1996) ("Any elective surgical procedure that may affect a member's physical qualification for duty should be completed before initiation of a medical board . . . .").

### a.  Convening a Medical Evaluation Board

The first stage in the Navy's disability evaluation system is the convening of an MEB.  SECNAVINST 1850.4D, ¶¶ 1008, 3102, 3104; DoDD 1332.18, ¶ 3.2.  An MEB is a body of physicians charged with identifying "members whose physical . . . qualification to continue on full duty is in doubt or whose physical . . . limitations preclude their return to full duty within a reasonable period of time."  SECNAVINST 1850.4D, ¶ 2042; accord MANMED, art. 18-1(1); see also id. art. 18-5(1) (providing that an MEB is convened when it is determined that a member, among other things, "has a condition which may permanently interfere with his or her ability to fulfill the purpose of service on active duty," "is temporarily unable to perform full duty, but return to full duty is anticipated and it is necessary to follow the patient for more than 30 days before final disposition is made, i.e., temporary limited duty (TLD) boards," or "suffers significant illness or injury which may impact on future service, even though the member may now appear to be physically qualified for full duty"), 18-5(3) (suggesting that evaluation by an MEB may be considered when, among other things, the "[t]otal time away from [the] parent command is likely to exceed 60 days," the "[m]ember [is] not likely to ever return to full duty," the "[p]hysician cannot estimate [the] prognosis or outcome for 45 days," the "[m]ember can return to duty but in a limited or restricted capacity," or the "[m]ember requires multiple surgeries").

Because it is not Navy policy "to retain members on active duty . . . to provide prolonged, definitive medical care when it is unlikely the member will return to full military duty," it is the responsibility of "line commanders, commanding officers of [medical treatment facilities,] and individual medical and dental officers [to] promptly identify for evaluation by Medical Boards

---

[16]  A member must undergo a physical examination prior to his or her separation from the Navy.  See Oral Arg. Tr. 37, Apr. 6, 2006 ("There is a requirement that members . . . [,] prior to being separated from the military service or when such separation is contemplated, . . . get a physical evaluation.").  Because referral into the disability evaluation system should be accomplished "as soon as it has been ascertained that return to full duty is unlikely, and optimal medical treatment benefits have been attained," SECNAVINST 1850.4D, ¶ 1009 (Dec. 23, 1998), it appears that a referral may occur during or after the separation physical examination.

. . . those members presenting for medical care whose physical . . . fitness to continue naval service is questionable." SECNAVINST 1850.4D, ¶ 1005; accord id. ¶ 3106. "Any condition that appears to significantly interfere with performance of duties . . . will be considered for MEB evaluation." Id. ¶ 8001(e). Included among those conditions are "[i]nternal derangement of the knee when there is residual instability following remedial measures such as surgery or physical therapy," id. ¶ 8002(b)(5), and "[s]pondylolysis and/or [s]pondylolisthesis requiring fusion with loss of mobility," id. ¶ 8002(j)(2)(b). However,

> the presence of the condition alone is often not a criteria for submission of a[n] MEB report–the member must have been tried on appropriate courses of medication (and proper use of [limited duty] status), been unresponsive to them, required untoward number of visits for medical care or hospitalizations and, just as importantly, the condition must be Unfitting.

Id. ¶ 8001(g).

### b.  Actions by the Medical Evaluation Board

After receiving a case, MEBs "evaluate and report on the diagnosis; prognosis for return to full duty; plan for further treatment, rehabilitation, or convalescence; estimate of the length of further disability; and medical recommendation for disposition of such members." Id. ¶ 2042. If the MEB finds that "the prognosis is that the member can be restored to full duty," it may authorize up to sixteen months of limited duty. Id. ¶ 2081; accord id. ¶ 1008(b) ("Members should be placed on [temporary limited duty] when the prognosis is that the member can be restored to full military duty within a reasonable period of time, usually 16 months or less."); see also MANMED, art. 18-29 (noting that, on the MEB's recommendation, a member may be placed on temporary limited duty for up to twenty-four months). If, on the other hand, the MEB finds that a "member's Fitness for continued active service [is] questionable," SECNAVINST 1850.4D, ¶ 3201(a), "because the member's condition most likely is permanent, and/or any further period of temporary limited duty (TLD) is unlikely to return the member to full duty,"[17] id. ¶ 3102(a), it will prepare a report and refer the case to the PEB, id. ¶¶ 3102(a)-(b), 3201(a). However, an MEB report should not be forwarded to the PEB if the member "is being processed for separation or retirement for reasons other than physical disability, unless . . . the member's physical condition reasonably prompts doubt that he or she is Fit to continue to perform" his or her duties. Id. ¶ 3202(g). Normally, the MEB should ensure that its report is received by the PEB within thirty days of the report's dictation.[18] See DoDI 1332.38, ¶ E3.P1.6.2.1 ("When a

---

[17] "A condition is considered permanent when the nature and degree of the condition render the member unable to continue naval service within a reasonable period of time (normally 12 months or less)." SECNAVINST 1850.4D, ¶ 3102(a).

[18] By starting the thirty-day clock at the date that the MEB report was dictated, the Department of Defense regulation provides more leeway than the Navy regulation meant to

physician initiates a[n] MEB, the processing time should normally not exceed 30 days from the date the MEB report is dictated to the date it is received by the PEB."); <u>accord</u> MANMED art. 18-13(1) ("No medical board will exceed 30 calendar days from the dictation of the medical board report and the time the completed package is mailed.").

     The MEB report "shall make a clear statement" of the MEB's "opinion that the member's condition does or does not render the member 'unable to continue naval service by reason of physical impairment.'"  SECNAVINST 1850.4D, ¶ 3901(a).  The MEB's "opinion must be supported by objective medical data displaying the nature and degree of the impairment, if any." <u>Id.</u>; <u>accord</u> <u>id.</u> ¶ 3201(a).  In addition, the MEB must "comprehensively describe the physical condition of a member" and "the nature and extent of the physical impairments . . . ." <u>Id.</u> ¶ 3901(a).  The MEB report must include (1) "the results of a complete medical physical examination"; (2) "all available information," properly authenticated, concerning "aggravation by service"; (3) "other significant facts pertaining to the impairments"; and (4) a nonmedical assessment.  <u>Id.</u>  The MEB is prohibited from making a finding of unfitness in its report, as such a conclusion is within the sole province of the PEB.  <u>Id.</u> ¶ 3901(c); MANMED, art. 18-1(2).  Members are entitled to receive a copy of the MEB report, "be counseled regarding the opinions and recommendations of the medical board," discuss the "opinions and recommendations with each member of the MEB," and "submit a statement regarding any portion of the MEB report."  SECNAVINST 1850.4D, ¶ 3208(a).

---

implement the Department of Defense regulation.  The Navy regulation provides that absent "unusual circumstances," SECNAVINST 1850.4D, ¶ 1009, an MEB report that refers a member to the PEB must be "processed, dictated, and received by the PEB within 30 days of the attending physician's desire to convene a medical board," <u>id.</u> ¶ 1009(a).  The court gives precedence to the Department of Defense regulation.  <u>See</u> <u>Hoskins v. United States</u>, 40 Fed. Cl. 259, 273 (1998) ("'Department of Defense regulations control when they conflict with regulations promulgated by the Air Force.'" (quoting <u>Poole v. Rourke</u>, 779 F. Supp. 1546, 1565 (E.D. Cal. 1991))); <u>Casey v. United States</u>, 8 Cl. Ct. 234, 239 (1985) ("To the extent that Army regulations conflict with those of the Department of Defense, the service regulations must give way."); <u>see also</u> <u>Layman v. Harvey</u>, No. 8:05-cv-2208-T-24-EAJ, 2007 WL 430678, at *8 n.8 (M.D. Fla. Feb. 5, 2007) ("The Army contends that Department of Defense directives are controlling over the Department of Defense instructions and Army regulations.  Since DODD 1332.38 authorizes the procedures for the instructions set forth in DODI 1332.28 regarding the disability evaluation system, this contention has merit.  Moreover, Layman does not cite to any authority contradicting the Army's position.").

### c. Physical Evaluation Boards

When the MEB refers a case to the PEB, the PEB may accept it or defer its acceptance.[19] Id. ¶¶ 3102(b), 3203(b).  If the case "lacks necessary or required information needed to determine Fitness, . . . eligibility for disability benefits, or an appropriate disability rating," the PEB may defer its acceptance of the case.  Id. ¶ 3203(b).  On the other hand, the PEB accepts the case when it has received "all medical and non-medical information necessary to evaluate the case appropriately . . . ."  Id. ¶ 3102(b).  Nonmedical information may include "an assessment of the member's performance of duty by his or her chain of command," which "may provide better evidence of the member's ability to perform his or her duties than a clinical estimate by a physician."  Id. ¶ 3205(a).  Nonmedical information may also include "[p]ertinent personnel records."  Id. ¶ 3205(b)(4).  "If a member is pending mandatory separation or retirement, such retirement or separation may only be deferred if the member is hospitalized or a medical board report has been accepted by the President, PEB for disability evaluation processing.  10 U.S.C. 640 applies."  Id. ¶ 3710.

The PEB's acceptance of a case triggers a multistage review process.  First, the "Informal PEB conducts a record review" and makes preliminary findings.  Id. ¶ 3102(b); accord id. ¶¶ 4201, 4208.  The PEB notifies the member of the preliminary findings and the member has fifteen days in which to accept or reject the findings.  Id. ¶ 3102(b); accord id. ¶¶ 4213-4214.  If the member accepts the findings or does not respond within fifteen days, the "case is finalized and service headquarters is requested to make an appropriate disposition . . . ."  Id. ¶ 3102(b); accord id. ¶¶ 4213(a)(1), (b)(1), (c)(1), (d)(1), 4214(e), 4215-4216.  If the member rejects the findings, "the member can request reconsideration of that decision by the same Informal PEB and/or demand/request a personal appearance before a Formal PEB."  Id. ¶ 3102(b); accord id. ¶¶ 4213(a)(2), (b)(2), (c)(2), (d)(2), 4313. "If the Formal PEB hears a case, it makes findings, and, subsequent to legal review and/or quality assurance review[,] findings are sent to the member . . . ."  Id. ¶ 3102(b); accord id. ¶¶ 4329-4330, 4336.  Once again, if the member accepts the findings, an appropriate disposition is made.  Id. ¶ 3102(b).  If the member rejects the findings, however, he or she may petition the Director of the Naval Council of Personnel Boards within fifteen days.  Id.; accord id. ¶¶ 4336(b)(1), (3), 4338, 5001-5006.  Further, at any time after a final decision has been reached, a member may petition the BCNR.  Id. ¶ 3102(b); accord id. ¶¶ 4336(b)(1), 4338.

---

[19]  In addition, there are several explicit grounds upon which the PEB may reject a case, see SECNAVINST 1850.4D, ¶ 3203(a), (d), but none of those grounds appear to be relevant in this case.  There is also an implied ground for rejection: the PEB may only consider conditions that constitute physical disabilities.  Id. ¶ 3401; see also id. ¶¶ 8001-8016 (describing the "medical conditions and physical defects which normally are cause for referral to the physical evaluation board").  There is no serious dispute that plaintiff's knee and back problems constitute physical disabilities that the PEB could consider; the dispute concerns only the severity and consequences of those problems.

The PEB uses only one standard in determining whether a member should be separated or retired due to physical disability: "Unfitness to perform the duties of office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to basic pay." Id. ¶ 3301; accord id. ¶ 3306(b).  "A service member shall be considered Unfit when the evidence establishes that the member, due to a physical disability, is unable to reasonably perform" his or her duties. Id. ¶ 3302(a); cf. DoDI 1332.38, ¶ E3.P3.4.1.3 ("Inability to perform the duties of his or her office, grade, rank, or rating in every geographic location and under every conceivable circumstance will not be the sole basis for a finding of unfitness."); SECNAVINST 1850.4D, ¶ 3304(a)(2)(a) ("Medical prohibition from taking all or a portion of the [physical readiness test/physical fitness test] may be used as the sole basis for a finding of Unfit to continue naval service"); MANMED, art. 18-26 ("When a medical waiver is granted for any portion (or all) of the physical readiness test (PRT) for three consecutive PRTs (over a minimum of 13 months), the member's commanding officer may refer the member for a medical board.").  Once a service member is declared to be unfit by the PEB, the PEB will either place the member on the permanent disability retired list, place the member on the temporary disability retired list, or retain the member on permanent limited duty.  SECNAVINST 1850.4D, ¶¶ 3702, 3705-3706, 3708, 6001-6011.

## B.  The BCNR's Remand Decisions

In its prior ruling, the court directed the BCNR to address "whether the Navy's failure to defer plaintiff's mandatory separation beyond March 15, 1999, constituted an injustice." Peoples, 87 Fed. Cl. at 580.  Thus, on remand, the BCNR reviewed the previously existing administrative record, as well as a June 26, 2006 rating decision from the VA,[20] and reached the following conclusion:

> The Board concluded that you failed to present sufficient evidence to demonstrate that an injustice exists in your record; your [MEB] report and associated documents contained all of the all [sic] medical and non-medical information necessary for the [PEB] to evaluate your case appropriately; your irregular retention on active duty beyond your statutorily dictated mandatory separation date extended your mandatory separation date and required the President, PEB to accept your MEB report; you were unfit for duty by reason of physical disability on 15 March 1999 and entitled to be retained on active duty beyond the latter date; or that your discharge was unfair or inequitable.

BCNR II at 1-2; see also BCNR III at 1 ("After careful and conscientious consideration of the entire record, the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice in your naval record."), 4 ("The Board concluded that your separation was proper, and that you have not demonstrated that the failure of Department of the Navy officials to retain you on active duty shocked the sense of justice or was

---

[20]  This rating decision is not part of the administrative record before the court.

otherwise unjust."). It later explained, in its decision on reconsideration, that "the phrase 'you failed to submit sufficient evidence to demonstrate that' was intended to apply to each of the succeeding clauses in the sentence in which the quoted clause appears." BCNR III at 1.

Although its multipart conclusion suggested that the BCNR would address each element of its conclusion separately, it did not do so. Rather, it presented its findings in a meandering, stream-of-consciousness exposition that only partly tracked the various elements of its conclusion. In an effort to summarize the BCNR's findings in a coherent manner, the court grouped them into several general categories, as set forth below.[21]

## 1. The Cause of Plaintiff's Separation

First, the BCNR found that plaintiff's separation was due to the Navy's failure to select him for promotion, and not due to any disability. It speculated why plaintiff was not promoted, suggesting that excessive body weight and adverse fitness reports might have been causes. It then noted that plaintiff's precommissioning physical examination revealed certain back and knee injuries and that there was no indication in his military record that he sustained any significant trauma to his knees or back during his service. It hypothesized that the worsening of plaintiff's knee and back problems was the result of his excessive body weight and participation in weightlifting activities. Finally, it stated that treatment and convalescence, absent unexpected complications, do not contribute to disability, and that plaintiff did not seek treatment for his back and knee problems until it was too late to complete the treatment and convalescence before his mandatory separation date. It specifically rejected plaintiff's contention that he only deferred treatment for his knee and back problems because he was consistently assigned to sea duty, concluding that plaintiff chose to forego treatment because he believed it would be in the best interests of himself and the Navy.

## 2. The Advisory Opinion

Second, the BCNR defended several aspects of the advisory opinion issued by the Director of the Naval Council of Personnel Boards. The BCNR agreed with the Director's assertion that plaintiff's acceptance of a reserve commission constituted evidence that plaintiff was fit for duty at that time, noting that such acceptance indicated plaintiff's belief that he was fit for duty and that plaintiff's subsequent receipt of the MRI findings did not alter plaintiff's status from fit to unfit. The BCNR also agreed with the Director's statement that plaintiff's search for employment prior to his separation was evidence of his fitness at that time, in light of the fact that plaintiff presumably considered himself unfit after his separation, when he sought welfare and disability benefits. Next, the BCNR averred that the record reviewed by the Director lacked a copy of plaintiff's final fitness report, and therefore the Director's presumption, based on the

---

[21] The court does not describe each of the BCNR's findings. The findings not summarized by the court—such as those addressing plaintiff's separation pay and disability benefits from the VA—are those that the court found not to be relevant to its decision.

absence of a fitness report, that plaintiff was fit for duty during the last eight to nine months of his active duty service was not improper.  The BCNR then stated that it interpreted the Director's reference to a lack of clinical urgency not as an implication that nonemergent conditions could not render a service member unfit, but rather as a suggestion that had plaintiff's back and knee problems been urgent or caused by a more serious problem, they were more likely to have been severe and, consequently, it was more likely that plaintiff may have been retained on active duty. Finally, the BCNR concurred with the Director's opinion that plaintiff's major medical issues occurred after his postseparation back surgery and that had plaintiff been retained on active duty, he would have been placed on limited duty and not found unfit by the PEB for some time thereafter.

### 3.  The Convening of the MEB

Third, the BCNR suggested that the convening of an MEB in plaintiff's case did not establish that an MEB was necessary.  It found that the primary reason that the MEB was convened was plaintiff's persistent requests for a referral to the PEB.  It also found that the notation on plaintiff's preseparation physical examination report that the MEB report contained a recommendation that plaintiff be retained on active duty was, in its experience, common in a situation such as plaintiff's, and therefore unremarkable.

### 4.  Referral of the MEB Report to the PEB

Fourth, the BCNR, citing various military regulations, found that had plaintiff not been facing mandatory separation, plaintiff's condition would have resulted in placement in a limited duty status rather than a referral to the PEB.  The BCNR also found that the MEB's recommendation was more consistent with a recommendation for limited duty than a recommendation for a fitness determination by the PEB.  Although it acknowledged the MEB's notation that plaintiff's case was being referred to the PEB, the BCNR concluded that the notation's different typeface was evidence that it was added upon the MEB's realization that plaintiff would not be retained on active duty absent such a referral.  Indeed, it noted that there was a common misconception that a service member could not be discharged until he or she no longer required medical care.  The BCNR concluded that the referral of the MEB report to the PEB was improper.

### 5.  The PEB's Treatment of the MEB Report

Fifth, the BCNR found that the PEB was not prohibited from rejecting an MEB report pending a service member's completion of surgical procedures meant to correct a condition that might have been unfitting.  And, it was not persuaded that the PEB would have accepted the MEB's report in plaintiff's case under any circumstances.

### 6. Plaintiff's Fitness for Duty

Sixth, the BCNR addressed whether certain statements and evidence in the administrative record demonstrated that plaintiff was unfit for duty at the time of his separation. It found that neither a medical waiver to take a physical readiness test nor a determination that a service member was not deployable established unfitness. It also found that the elective nature of plaintiff's surgeries, which were meant to correct longstanding problems rather than emergent conditions, suggested that plaintiff was fit for duty at the time they were recommended. The BCNR further found that because plaintiff's back and knee problems were not particularly severe and did not significantly impair his ability to perform his duties, plaintiff was fit for duty and retention on active duty past his mandatory separation date was neither justified nor required. Next, the BCNR found that the letter from plaintiff's commanding officer, made part of the MEB package, did not support a finding that plaintiff was unfit for duty. Finally, it found that the objective evidence described in the VA's 2006 rating decision supported a disability rating of no more than twenty percent.

### 7. Plaintiff's Brief Retention on Active Duty Beyond His Mandatory Separation Date

Seventh, and lastly, the BCNR concluded that plaintiff's retention on active duty beyond his March 1, 1999 mandatory separation date was irregular, and did not actually extend the mandatory separation date. It thus found that had the Navy resubmitted the MEB package to the PEB after March 1, 1999, the submission would have been untimely and the PEB would not have been required to accept it.

### C. The BCNR's Decisions Are Supported by Substantial Evidence

The court's task is to determine whether the BCNR properly found that no injustice existed in plaintiff's case. Injustice "is treatment by the military authorities, that shocks the sense of justice, but is not technically illegal." Reale v. United States, 208 Ct. Cl. 1010, 1011 (1976). Correction boards, including the BCNR, are empowered to remove an injustice from a service member's military record. 10 U.S.C. § 1552(a) (2000); 32 C.F.R. § 723.2(b). Thus, "when a correction board fails to correct an injustice clearly presented in the record before it, it is acting in violation of its mandate." Yee v. United States, 512 F.2d 1383, 1387 (Ct. Cl. 1975); accord Melendez Camilo v. United States, 642 F.3d 1040, 1044 (Fed. Cir. 2011); Roth v. United States, 378 F.3d 1371, 1381 (Fed. Cir. 2004); see also Skaradowski v. United States, 471 F.2d 627, 632 (Ct. Cl. 1973) (finding that a correction board's failure to correct a record containing an "obvious injustice" was "not supported by substantial evidence"). Indeed, correction boards have "an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief." Caddington v. United States, 178 F. Supp. 604, 607 (Ct. Cl. 1959); accord Roth, 378 F.3d at 1381.

As with any other attempt to overturn a correction board's decision, recovery for a correction board's failure to correct an alleged injustice is predicated on proof that the failure was

"arbitrary, capricious, contrary to law, or unsupported by substantial evidence." Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005); see also Yee, 512 F.2d at 1387 (concluding that a failure to correct an injustice clearly presented in the record is arbitrary and capricious). This standard "is broadly referred to as the 'substantial evidence' rule . . . ." Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951), quoted in Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006); see also Bray v. United States, 515 F.2d 1383, 1391 (Ct. Cl. 1975) ("Evidence, to be substantial, must be evidence that would convince an unprejudiced mind of the truth of the facts to which it is directed."). To determine whether substantial evidence supports a decision, "[a] reviewing court must consider the record as a whole, including that which 'fairly detracts from its weight' . . . ." Nippon Steel Corp., 458 F.3d at 1351 (quoting Universal Camera Corp., 340 U.S. at 488). However, the court must "bear in mind that '[e]xaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, imprecision, and errors detract from the weight to be accorded the evidence upon which an administrative board bases its decision.'" Dixon v. Dep't of Transp., FAA, 8 F.3d 798, 804 (Fed. Cir. 1993) (quoting Spurlock v. Dep't of Justice, 894 F.2d 1328, 1330 (Fed. Cir. 1990)). The court is not to reweigh the evidence, but instead must look to see if exaggeration, improbability, self-contradiction, omissions, imprecision, or errors "detract from the weight of that particular evidence." Id.; see also Heisig, 719 F.2d at 1157 ("[T]he standard of review does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence."). If the detraction is of such a magnitude that "a reasonable fact-finder would not find the charge proved by a preponderance of evidence," Dixon, 8 F.3d at 804, or if the court "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view," Universal Camera Corp., 340 U.S. at 488, the court may set aside the decision.

When substantial evidence does not support a correction board's decision that a military record does not contain an injustice, "the abuse of administrative discretion rises to the level of legal error which merits judicial relief." Sanders v. United States, 594 F.2d 804, 813 (Ct. Cl. 1979) (en banc), superseded in part by statute, 10 U.S.C. § 628 (2000 & Supp. I 2002), as recognized in Richey v. United States, 322 F.3d 1317, 1323-24 (Fed. Cir. 2003). However, it is rare for a court to find that a correction board improperly declined to correct a record to rectify an injustice, likely "because the proof must overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith" and "[s]trong policies compel the court to allow the widest possible latitude to the armed services in their administration of personnel matters." Id.; accord Dodson v. U.S. Gov't, Dep't of the Army, 988 F.2d 1199, 1204 (Fed. Cir. 1993) ("[M]ilitary administrators are presumed to act lawfully and in good faith . . . , and the military is entitled to substantial deference in the governance of its affairs."). Accordingly, even if a court disagrees with a correction board's conclusion "about whether or not a specific situation was unjust, [it] will not

-24-

substitute [its] judgment for the board's when reasonable minds could reach differing conclusions." Sanders, 594 F.2d at 814; accord Heisig, 719 F.2d at 1156.

In this case, the BCNR concluded that plaintiff's record did not demonstrate that the Navy's failure to retain plaintiff on active duty beyond March 15, 1999, constituted an injustice. The BCNR's reasons for this conclusion were presented in a convoluted manner. Nevertheless, a thorough review of the various findings in the BCNR's decisions on remand reveals that the BCNR ultimately determined that the Navy's failure to retain plaintiff on active duty beyond March 15, 1999, was not unjust for two reasons. First, there was insufficient information at the time of plaintiff's separation for the PEB to determine plaintiff's fitness for duty, and second, what information did exist indicated that plaintiff was fit for duty on March 1, 1999, his official mandatory separation date.

As an initial matter, the BCNR has provided valid reasons for its conclusion that there was no injustice in plaintiff's case. In its prior ruling, the court concluded that based on the relevant regulations, the referral of plaintiff's MEB report to the PEB was proper and the PEB should not have rejected the MEB package as untimely. Peoples, 87 Fed. Cl. at 574-75. The PEB, however, could have deferred its acceptance of plaintiff's MEB package if the package lacked the information it required to ascertain plaintiff's fitness for duty. See SECNAVINST 1850.4D, ¶ 3203(b). And, the BCNR is empowered to act as a PEB and make a fitness determination in the first instance. See Barnick v. United States, 591 F.3d 1372, 1380 (Fed. Cir. 2010) ("The Board is competent to make . . . a retroactive disability determination."); Sawyer v. United States, 930 F.2d 1577, 1581 (Fed. Cir. 1991) (noting that correction boards are "competent to make a disability determination in the first instance").

Furthermore, the BCNR's rationale for declining to find an injustice in plaintiff's case is supported by substantial evidence. Consistent with the BCNR's findings, the evidence in the administrative record demonstrates that the PEB did not have all of the information it required to determine plaintiff's fitness for duty because plaintiff had not yet undergone his knee and back surgeries.[22] Accordingly, the BCNR could reasonably conclude that the PEB would have deferred acceptance of plaintiff's case, allowing the Navy to discharge plaintiff on his mandatory separation date.

In addition, the BCNR's findings that plaintiff was separated from the Navy for nonselection for promotion, not for disability, and that plaintiff experienced no trauma to his back or knees during his service are fully supported by the evidence in the administrative record.

---

[22] The court notes that in its prior ruling, it indicated that there was "no evidence in the record that the package did not contain all of the required information . . . ." Peoples, 87 Fed. Cl. at 574. The BCNR's decisions on remand provided the court with a fuller understanding of the significance of plaintiff's surgeries to a fitness determination. Accordingly, the court concludes that the MEB package did not contain all of the information required by the PEB to make a fitness determination.

The record evidence also adequately supports the BCNR's findings that plaintiff chose not seek treatment for his back and knee problems until it was too late to complete the treatment and convalescence before his mandatory separation date and that plaintiff's back and knee problems were not particularly severe and did not significantly impair his ability to perform his duties. Accordingly, the BCNR could reasonably conclude that plaintiff was actually fit for duty at the time of his mandatory separation, obviating the need to correct plaintiff's record to direct that plaintiff's case be processed by the PEB for a fitness determination.

The court recognizes that certain aspects of the BCNR's decisions are troublesome. For example, the BCNR's conclusion that the MEB should not have been convened and the BCNR's finding that an MEB package resubmitted to the PEB after March 1, 1999, would have been untimely are both contrary to express holdings of the court in its prior ruling. Also contrary to the court's prior holdings is the BCNR's defense of portions of the advisory opinion of the Director of the Naval Council of Personnel Boards. In fact, it is highly problematic that the BCNR continued to rely on the Director's advisory opinion after acknowledging that the Director did not base his decision on plaintiff's complete record.

The BCNR's decisions also contain inaccuracies. For one, the BCNR's finding that the PEB was convened at plaintiff's request is incorrect; not only was the PEB convened at the request of plaintiff's orthopedist, but the Navy is presumed to act in accordance with its regulations, which prohibit the convening of a PEB at a service member's request. See SECNAVINST 1850.4D, ¶ 3202(b). In addition, the BCNR's conclusion that a medical waiver to take a physical readiness test does not establish unfitness is contrary to SECNAVINST 1850.4D, ¶ 3304(a)(2)(a), which does allow for a finding of unfitness based solely on such a waiver.

Furthermore, the BCNR's speculation on several topics–including the reasons why plaintiff was not promoted, the reasons why plaintiff's condition worsened throughout his career, and what might have happened had plaintiff's back and knee problems been caused by conditions that plaintiff did not have–is wholly irrelevant to its determination that plaintiff was fit for duty at the time of his mandatory separation. Also irrelevant to the BCNR's fitness determination are the major problems plaintiff experienced postseparation and the VA's 2006 rating decision, as such evidence does not concern whether plaintiff was fit for duty at the time of his separation.

The problematic nature of these findings, however, is of little assistance to plaintiff because almost all of the questionable findings do not relate, either directly or indirectly, to the rationale advanced by the BCNR in support of its conclusion that there was no injustice in plaintiff's case. Not one of these findings concerns whether the PEB had sufficient information at the time of plaintiff's mandatory separation to make a fitness determination. And only one concerns whether plaintiff was fit for duty on March 1, 1999: the BCNR's inaccurate statement that a medical waiver for a physical readiness test may not provide the basis for an unfitness determination. This erroneous assertion, however, does not sufficiently cut against the other evidence establishing plaintiff's fitness for duty on March 1, 1999. Accordingly, the

aforementioned findings, as troublesome as they are, do not detract from the substantial record evidence in support of the BCNR's rationale.

In sum, the BCNR's rationale for declining to find an injustice in plaintiff's case is supported by substantial evidence.  As a result, the BCNR's conclusion that plaintiff's military record does not contain an injustice is also supported by substantial evidence.

### III.  CONCLUSION

For the reasons set forth above, the court **DENIES** plaintiff's motion for judgment on the administrative record and **GRANTS** defendant's cross-motion for judgment on the administrative record.  No costs.  The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge